T.C. Memo. 1998-367


UNITED STATES TAX COURT


JAMES L. SULLIVAN AND DOROTHY B. SULLIVAN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 3332-96.                    Filed October 8, 1998.


<u>Bruce Locke</u>, for petitioners.

<u>Roberta L. Shumway</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


GALE, <u>Judge</u>:  Respondent determined a deficiency of
$21,561.45 in petitioners' Federal income tax for taxable year
1992.  The issue for decision is whether petitioners' horse
breeding and showing activities constitute an "activity not

engaged in for profit" within the meaning of section 183.[1]

## FINDINGS OF FACT[2]

Petitioners were married and filed a joint Federal income tax return for the taxable year 1992. At the time the petition was filed, they resided in Hockley, Texas.

Commencing in 1969, petitioners have been involved in activities that include the breeding, care, showing, and occasional sale of cutting horses (horse-related activities). Cutting horses are quarter horses that are bred and trained to be ridden into a herd of cattle to separate, or "cut", one cow from the rest of the herd. Historically, the use of cutting horses was to remove a cow from a herd for individual handling, such as for medical attention. However, performing this function has become a sport, and cutting horse competitions are held throughout the United States where prize money is awarded with respect to horses that are judged best at "cutting". Horses with records of superior performance at cutting horse competitions appreciate substantially.

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2] Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference.

Since 1969, petitioners have owned as many as 20 horses and as few as five. In 1992, they owned six horses, including two stallions. Petitioners initially boarded their horses but in 1976 purchased a 17-acre tract on which they built a residence and have since kept most of their horses. The property includes a barn that can accommodate six horses, other equine facilities, and 10 acres of pasture.

Petitioners' horse-related activities were conducted predominantly by Mrs. Sullivan during 1992. Mr. Sullivan worked 80 to 100 hours per week in his business, Sullivan Money Management, Inc., during the year and does not ride or show horses. During 1992, Mrs. Sullivan devoted 6 to 7 hours per day on weekdays to their horse-related activities and a like amount of time on weekends when she participated in horse shows. At the time of trial, Mrs. Sullivan rode in nonprofessional and novice class shows. Mrs. Sullivan provided most of the manual labor required in caring for their horses, such as cleaning stables, without the assistance of hired labor. Petitioners paid third parties for veterinary, training, and farrier services and, in 1992, they paid a professional trainer to show one of their stallions in competition. Petitioners have never trained other people's horses as part of their horse-related activities.

Mrs. Sullivan has had a longstanding interest in horses, from the time she was 14. She participated in rodeo and hunter-

jumper competitions while in high school and college. After college, Mr. and Mrs. Sullivan repurchased the horse Mrs. Sullivan had ridden while in high school. Mrs. Sullivan has considerable experience and knowledge with respect to cutting horses, including familiarity with championship bloodlines and the like. She acquired knowledge about cutting horses by talking to horse trainers, owners, and breeders between 1969 and the present, attending clinics, reading cutting horse periodicals, and through her personal experiences. Although during 1992 she held no position, Mrs. Sullivan was on the board of the Houston Cutting Horse Association from 1973 to 1980, on the board of the Sam Houston Horse Breeders Association from 1974 to 1979, on the board of the Central Texas Horse Breeders Association from 1975 to 1978, a National Cutting Horse Association judge from 1975 to 1986, and a Director of the National Cutting Horse Association from 1978 to 1980.

In conducting their horse-related activities, petitioners also relied upon the advice and assistance of two individuals, Olan Hightower and Sam Wilson, each of whom has earned a living for approximately 40 years from the breeding, training, and sale of cutting horses and other quarter horses. Mr. Wilson, with whom petitioners boarded their horses prior to obtaining their own facilities in 1976, operates a breeding farm on 250 acres of land and anticipated breeding approximately 250 mares during the

year of trial.  Mr. Hightower generally keeps 20 to 22 horses. In addition to breeding and selling horses, both Mr. Wilson and Mr. Hightower earn income from training other people's horses. During 1992, two of petitioners' horses were trained at Mr. Hightower's ranch, and Mr. Hightower was paid $19,432 for training and showing petitioners' horses for cutting horse competitions.  Mr. Hightower and Mr. Wilson provided advice with respect to petitioners' breeding decisions, training of horses, and competition.  Their advice did not cover the financial aspects of running a cutting horse operation.

Mr. Sullivan was employed as an investment manager with Sullivan Money Management, Inc., in 1992 and previously with Painewebber, Inc.  His earnings from employment were as follows:

| Year | Earnings |
|------|----------|
| 1989 | $90,000.00 |
| 1990 | 90,000.00 |
| 1991 | 97,500.00 |
| 1992 | 108,750.00 |
| 1993 | 101,250.00 |
| 1994 | 90,000.00 |
| 1995 | 107,992.20 |

He has both a bachelor and master of business administration degree from the University of Texas.

The value of a cutting horse depends upon its possession of desirable physical characteristics (conformance), its demonstrated proficiency in cutting horse competitions, and, in the case of a stallion, its demonstrated capacity to pass along

desirable traits to offspring, as evidenced by the offspring's performance at cutting. Extensive training, which begins around age 2, is required to prepare a horse for cutting horse competition and costs $500 to $1,500 per month. A cutting horse may demonstrate proficiency in competition rather quickly, as for example making the finals in an initial competition held for 3-year-olds, the "Futurity" sponsored by the National Cutting Horse Association, or through a more lengthy process of competing in numerous weekend events, called "campaigning", in which points are awarded that may qualify the horse for the finals of the annual National Cutting Horse Association World Championship. There are classes of competition for both professional and nonprofessional riders, and if the horse competes with a professional rider, the rider generally must be compensated. Although prize money is also awarded at these competitions, the transportation costs, entry fees, and other expenses associated with participation generally exceed such prize money by a factor of 3 to 1. Horses with records of superior performance at competitions are valuable, especially stallions that also demonstrate an ability to pass along desirable traits to offspring. A superior mare or gelding may be worth $30,000 to $100,000 and a superior stallion, $100,000 to $1 million. Such a stallion can command a fee of $5,000 per breeding.

Mrs. Sullivan used her knowledge of bloodlines to acquire,

through considered breeding strategies, horses of superior lineage--that is, horses descended from proven champions. Petitioners would then incur the expense of training the horses and entering them in competitions in an effort to demonstrate their worth. Petitioners had a stallion, Docs Fancy Feat, they considered quite promising in the 1980's. Docs Fancy Feat was born in 1976, and as a 3-year-old missed by one-half point making the finals in "open" (professional) class competition in the National Cutting Horse Association Futurity in 1979. He was ridden in that competition by Mr. Hightower. As a result, Mrs. Sullivan embarked on a lengthier process of campaigning him at weekend events in an effort to qualify for the World Championship. In 1981, Mrs. Sullivan became pregnant and did not ride Docs Fancy Feat in competition in the remainder of that year or 1982. As a result, the horse was sent to a trainer in Arizona who wished to campaign him. However, the trainer's feeding practices caused Docs Fancy Feat to suffer colic, which is potentially lethal in horses, and he consequently was returned to petitioners in December 1981. The horse then required remedial training for nearly 1 year to reverse certain undesirable training received in Arizona. Sometime during the period starting in late 1982 and continuing through the end of 1985, Mrs. Sullivan twice suffered ankle injuries. Docs Fancy Feat injured his leg in 1987, necessitating a year's rest from

competition.  Upon resumption of competition in 1988, he reinjured the leg, causing permanent crippling.  Petitioners estimated the value of Docs Fancy Feat at the time of trial as $20,000.  The record does not contain Docs Fancy Feat's breeding records.

Sometime in 1985, Mrs. Sullivan concluded that it would be advisable to experiment with a new bloodline.  Docs Fancy Feat's lineage was from Doc Bar, a champion cutting horse whose bloodline was so popular among cutting horse enthusiasts that there was a proliferation of "Doc Bar" cutting horses.  Mrs. Sullivan anticipated there would be a growing demand for superior non-"Doc Bar" horses to be bred to the large numbers of "Doc Bar" horses.  Consequently, she arranged a breeding of one of her successful non-"Doc Bar" mares with a non-"Doc Bar" champion stallion, Colonel Freckles.  The result was a colt, Colonel Rey Lew, born in 1986.  Colonel Rey Lew did not enter the National Cutting Horse Association Futurity as a 3-year-old.  Starting in 1989, he has been bred 22 times; his breeding fee in 1992 was $500.  He was bred seven times in 1991, and three to four times per year from 1992 through 1995.  Mr. Hightower was paid to campaign Colonel Rey Lew in "open" or professional class weekend competitions during 1992, in which the horse qualified for the "open" finals of the National Cutting Horse Association World Championship.  Mrs. Sullivan campaigned Colonel Rey Lew in

nonprofessional class weekend competitions in 1994 and likewise qualified for the nonprofessional finals of the World Championship. Petitioners consider Colonel Rey Lew to be a very promising stallion. At the time of trial, they estimated his value to be between $100,000 and $150,000. Including Colonel Rey Lew, the total value estimated by petitioners for the eight horses they owned at the time of trial was between $170,000 and $222,500.

Petitioners sold two horses between 1989 and 1990, which failed to show promise as cutting horses, for $3,500 and $4,000, respectively. Petitioners did not sell any horses during 1992. Of the six horses they owned in 1992, one was sold in 1993 for $6,500 and another in 1995 for $3,500. There is no evidence concerning the sale of any other horses that petitioners owned between 1989 and 1995, except Miss Doc Chic, purchased by petitioners for $100 in 1992 and sold back to the seller by them approximately 18 months later for $100. During the period they owned Miss Doc Chic, petitioners treated the expenses of her upkeep and costs associated with her entry in cutting horse competitions as part of their horse-related activities. Mrs. Sullivan rode Miss Doc Chic in nonprofessional class competitions[3] during 1992 when Mr. Hightower was riding Colonel

---

[3] In order to qualify for nonprofessional competition, the horse must be ridden by an owner who is not a professional
(continued...)

Rey Lew in professional class competitions.

Petitioners ceased insuring their horses in 1982.

Mrs. Sullivan maintained detailed records of their horse-related activities in 1992 which included the events in which their horses competed, expenses, and winnings.

Petitioners have reported a loss from their horse-related activities for every year from 1969 through 1995, except for the years 1972, 1981, and 1982. The record does not disclose the magnitude of the losses that occurred from 1969 through 1988. The income, deductions, and net losses reported by petitioners on their Schedule C for the years 1989 through 1995 are as follows:

| Year | Gross Receipts/Income | Deductions | Net Loss |
|------|----------------------|------------|----------|
| 1989 | $22,380.49 | $63,306.14 | $40,925.65 |
| 1990 | 13,336.31 | 53,305.36 | 39,969.05 |
| 1991 | 17,616.87 | 49,964.14 | 32,347.27 |
| 1992 | 21,465.62 | 72,760.23 | 51,294.61 |
| 1993 | 17,186.27 | 51,246.78 | 34,060.51 |
| 1994 | 25,130.04 | 72,298.66 | 47,168.62 |
| 1995 | 14,874.82 | 48,379.64 | 33,504.82 |

Petitioners made a profit of $985.05 in 1972, $7,336.07 in 1981, and $11,742.18 in 1982, for a total profit of $20,063.30 during the 26 years in which they have been engaged in their horse-related activities. Petitioners have no plans to discontinue their horse-related activities.

In the notice of deficiency, respondent determined that

---

[3](...continued)
trainer.

petitioners were not engaged in their horse-related activities for profit within the meaning of section 183(a) and disallowed the loss for 1992.

OPINION

The issue to be resolved is whether petitioners' horse-related activities[4] constituted an "activity not engaged in for profit" within the meaning of section 183.  Section 183(a) generally disallows a deduction for activities not engaged in for profit except as provided in section 183(b).  Section 183(b)(1) allows deductions for an activity which are otherwise allowable regardless of profit objective.  Section 183(b)(2) allows those deductions which would be allowable if the activity were engaged in for profit, but only to the extent that gross income attributable to the activity exceeds the deductions permitted by section 183(b)(1).  Section 183(c) defines "activity not engaged in for profit" as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212."

Deductions are allowable under section 162 with respect to activities for which the taxpayer has demonstrated that his "primary purpose for engaging in the activity * * * [was] for income or profit."  <u>Commissioner v. Groetzinger</u>, 480 U.S. 23, 35

---

[4] The parties have treated all of petitioners' horse-related activities as a single activity for purposes of sec. 183.  See sec. 1.183-1(d)(1), Income Tax Regs.

(1987).  Similarly, deductibility under section 212 depends upon whether the expenditures were made "primarily in furtherance of a bona fide profit objective."  Agro Science Co. v. Commissioner, 934 F.2d 573, 576 (5th Cir. 1991), affg. T.C. Memo. 1989-687.

It is therefore the taxpayer's intent to earn a profit that determines the deductibility of an activity's losses under section 183.  Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); Bessenyey v. Commissioner, 45 T.C. 261, 273-274 (1965), affd. 379 F.2d 252 (2d Cir. 1967).  Such intent is to be determined by examining all the facts and circumstances, giving greater weight to objective facts than to the taxpayer's statement of intent.  Siegel v. Commissioner, 78 T.C. 659, 699 (1982); Engdahl v. Commissioner, 72 T.C. 659, 666 (1979); sec. 1.183-2(a) and (b), Income Tax Regs.  Although a reasonable expectation of profit is not required, the facts and circumstances must indicate that the taxpayer entered into the activity, or continued the activity, with the actual and honest objective of making a profit.  Keanini v. Commissioner, 94 T.C. 41, 46 (1990); Dreicer v. Commissioner, supra at 644-645; sec. 1.183-2(a), Income Tax Regs.  The taxpayer bears the burden of proving the requisite profit objective.  Rule 142(a); Dreicer v. Commissioner, supra at 646; Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981).  Moreover, the Court of

Appeals for the Fifth Circuit, to which this case is appealable, has stated that taxpayers whose activities are challenged under section 183 "bear the burden of proving that their activities * * * were engaged in with the primary purpose of earning a profit." Westbrook v. Commissioner, 68 F.3d 868, 876 (5th Cir. 1995), affg. per curiam T.C. Memo. 1993-634. (Emphasis added.)

Section 1.183-2(b), Income Tax Regs., sets forth a nonexclusive list of factors that should normally be taken into account in determining whether the requisite profit objective has been shown. The factors are: (1) Manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer; (4) expectation that assets used in activity may appreciate in value; (5) the success of the taxpayer in carrying on similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation. No single factor is determinative. Sec. 1.183-2(b), Income Tax Regs.

Petitioners argue that their horse-related activities were engaged in for profit because they were trying, albeit with limited success, to develop a championship quality cutting horse stallion that would appreciate in value substantially and command

breeding fees of as much as $5,000, and that the work required of Mrs. Sullivan in pursuit of that goal was far too onerous to constitute recreation.  Respondent contends that petitioners' long history of losses demonstrates that their horse-related activities were not profit-oriented, but instead served Mrs. Sullivan's personal and recreational interests, given her longstanding passion for horses.  We shall evaluate the evidence of profit motive with reference to the factors enumerated in the regulations and any other relevant indicia.

Manner in Which Activity Conducted

The fact that a taxpayer carries on the activity in a businesslike manner and maintains complete and accurate books and records may indicate that the activity was engaged in for profit. Sec. 1.183-2(b)(1), Income Tax Regs.  Petitioners point to the detailed records that Mrs. Sullivan maintained as evidence of the businesslike conduct of their horse-related activities.  However, if there is a lack of evidence that the taxpayer's records were utilized to improve the performance of a losing operation, such records generally do not indicate a profit motive.  Golanty v. Commissioner, supra at 430; Osteen v. Commissioner, T.C. Memo. 1993-519, affd. in part and revd. in part 62 F.3d 356 (11th Cir. 1995); see also Burger v. Commissioner, 809 F.2d 355, 359 (7th Cir. 1987), affg. T.C. Memo. 1985-523.  Despite more than 2 decades of losses, petitioners presented no convincing evidence

that their records were used to devise methods of modifying their operations to improve profitability.  Mrs. Sullivan testified merely that she reviewed the records to economize generally and to insure that she was receiving the "best buys" on supplies. Mr. Sullivan conceded that he reviewed the records only "when I make out the income taxes".  Since the records were not employed to improve operations or stem the recurring, significant losses from petitioners' horse-related activities, we discount them. Golanty v. Commissioner, supra; Bessenyey v. Commissioner, supra at 274.

A change of operating methods or abandonment of unprofitable methods in a manner consistent with an intent to improve profitability may indicate a profit motive.  Sec. 1.183-2(b)(1), Income Tax Regs.  Petitioners contend that their decisions to cease insuring their horses and to purchase only used trucks after 1982 constitute changes in operating methods designed to improve profitability.[5]  The evidence provided by petitioners is too sketchy to be persuasive of their claim.  Although Mr. Sullivan provided some testimony regarding current costs for horse insurance, without more information regarding the value of petitioners' horses over the years, the significance of insurance

_____

[5] Petitioners also argue that Mrs. Sullivan performed all of the unskilled manual labor attendant to keeping horses (such as cleaning stables) and paid only for veterinarians, trainers, and farriers.  However, there is no evidence that this practice represents any change in their mode of operation from the outset.

savings in relation to petitioners' losses cannot be assessed for most years.  However, for 1992, if we accept petitioners' estimate of the value of their horses in that year, and Mr. Sullivan's testimony that premiums for horse insurance are approximately 4 percent of value, the cost of insurance is relatively small in relation to the $51,295 in losses incurred that year.  There is no evidence of the savings from purchasing used trucks.  On this record, we do not believe petitioners have shown that the foregoing cost-cutting measures were material in relation to the losses they were regularly incurring.  Cf. <u>Taras v. Commissioner</u>, T.C. Memo. 1997-553; <u>Smith v. Commissioner</u>, T.C. Memo. 1997-503.

Petitioners cite their 1985 decision to try a different bloodline as evidence of a change in operating methods to improve profitability.  While we believe this change constitutes the type of change contemplated in the regulations, it has not stemmed petitioners' substantial losses, and 10 years of unbroken losses have followed it.  Moreover, the absence of any <u>additional</u> significant changes since 1985, in the face of losses of the magnitude being incurred by petitioners through 1995, creates an inference adverse to petitioners' profit motivation.

A profit motive may be indicated where an activity is carried on in a manner substantially similar to other activities of the same nature which are profitable.  Sec. 1.183-2(b)(1),

Income Tax Regs. Petitioners maintain that the manner in which they conducted their horse-related activities was substantially similar to that of two other breeders, Mr. Hightower and Mr. Wilson, each of whom has earned a living from horse operations for approximately 40 years. We reject the contention that petitioners' activities are comparable, however. The activities of Mr. Hightower and Mr. Wilson were more extensive than petitioners'. Petitioners owned six horses, a six-horse barn, and 10 acres of pasture in 1992. They produced evidence with respect to the breeding of only one horse, and in 1992 that horse was bred only three times. Mr. Wilson had three stallions and 250 acres and anticipated breeding approximately 250 mares in the year of trial. Mr. Hightower generally kept 20 to 22 horses. Petitioners also conceded they did not enter horses in competitions as extensively as Mr. Hightower and Mr. Wilson did, even though all testimony in the case indicated that extensive nationwide competition was an important means of proving a horse's value. Perhaps the most critical difference is that both Mr. Wilson and Mr. Hightower earned income in their operations by training other people's horses. Petitioners not only did not train others' horses, they paid for training, in significant amounts so far as the record reveals.[6] In 1992, petitioners paid

---

[6] The only year for which any break-out of petitioners' training expenses is available is 1992.

Mr. Hightower $19,432 to train and show their horses at competitions, which amount equals approximately 38 percent of their net loss of $51,295. Both Mr. Hightower and Mr. Wilson testified that training income was an important component in meeting their expenses. Had petitioners generated training income instead of expense, they may have shown a profit. In any event, the fact that training for petitioners was a significant expense rather than a source of income distinguishes their horse-related activities from the profitable cutting horse operations in evidence.

Finally, there is evidence that petitioners conducted their horse-related activities in an unbusinesslike manner. First, petitioners purchased Miss Doc Chic for a nominal sum ($100) in 1992 and resold her to the seller 18 months later for the same amount. Forgoing the right to any appreciation in value while paying (and deducting) the horse's training and competition expenses was not a businesslike transaction. Petitioners' explanation for this transaction is that it was the most cost effective means of providing Mrs. Sullivan with a horse on which to compete in 1992 to keep her riding skills honed because their prize stallion (Colonel Rey Lew) was being ridden in competition by Mr. Hightower that year. Although there is evidence in the record that a cutting horse's full value is demonstrated by its performance with both professional and nonprofessional riders,

and evidence that Mrs. Sullivan supplied the latter service, we believe on balance that the transaction involving Miss Doc Chic demonstrates that Mrs. Sullivan's actual participation in cutting horse competition, which undeniably has a substantial recreational component, was an important priority in petitioners' horse-related activities.

Second, although it is petitioners' contention that a key component of a cutting horse stallion's value is the demonstrated performance of his offspring, at trial they were uncertain of the number of offspring sired by their current prize stallion (Colonel Rey Lew) and were familiar with the performance of only seven or eight such offspring, whereas there were 22 documented breedings of that stallion. Thus we do not believe petitioners were documenting the value of their stallion in a businesslike manner.

Petitioners also argue that their use of stallions, rather than geldings or mares, in cutting horse competitions indicates that they conducted their activities as a business rather than a hobby. According to petitioners and other knowledgeable witnesses, stallions are less tractable and more temperamental than geldings or mares, and thus using stallions in cutting horse competitions is much more difficult. A hobby enthusiast would utilize a gelding or mare in cutting horse competitions, it is argued; only a business-oriented participant, interested in the

profits from breeding fees and greater appreciation potential in a champion stallion, would undergo the greater difficulties of riding or showing stallions in cutting horse competitions.

Expertise of Petitioners

Preparation for an activity by extensive study or consultation with experts may indicate a profit motive where the taxpayer conducts the activity in accordance with such study or advice. Sec. 1.183-2(b)(2), Income Tax Regs. We believe the record amply demonstrates that Mrs. Sullivan developed expertise in cutting horse bloodlines, breeding, and showing. She attended several clinics over the years, read industry publications, and followed the advice of acknowledged experts with respect to the breeding, training, and showing of horses. She held leadership and judging positions with various equine organizations over many years. However, expertise with respect to the breeding and showing of horses and other animals is to be distinguished from expertise in the economics of these undertakings. See, e.g., Burger v. Commissioner, 809 F.2d at 359; Surridge v. Commissioner, T.C. Memo. 1998-304; Dodge v. Commissioner, T.C. Memo. 1998-89; Smith v. Commissioner, T.C. Memo. 1997-503; see also Golanty v. Commissioner, 72 T.C. at 432. Mrs. Sullivan had no experience with the economics of a profitable cutting horse operation, and her consultations with experts did not include advice regarding the financial aspects of petitioners' horse-

related activities.  Expertise regarding breeding and competition is not inconsistent with the pursuit of cutting horse activities as a hobby, and we thus do not attach great significance to Mrs. Sullivan's knowledge and experience in these areas in deciding whether a profit motive can be inferred.

Petitioners' apparent inability to provide all of the training necessary for their horses to perform as cutting horses is also relevant.  As previously discussed, whereas the two profitable cutting horse professionals who testified at trial both engaged in extensive training of cutting horses for compensation, petitioners did not do so.  We believe the lack of this expertise figured prominently in their history of losses.

Time and Effort Expended

The fact that the taxpayer devotes much of his or her personal time and effort to carrying on an activity, particularly if the activity does not have substantial recreational aspects, may indicate a profit motive.  Sec. 1.183-2(b)(3), Income Tax Regs.  In 1992 Mrs. Sullivan was predominantly involved in petitioners' horse-related activities, as Mr. Sullivan spent 80 to 100 hours per week working at his business.  Petitioners place considerable emphasis on the hours devoted by Mrs. Sullivan and argue that the onerous manual labor performed by her in caring

for the horses,[7] such as cleaning stables, as well as her arduous schedule of attending horse shows most weekends, was too unpleasant to constitute a hobby.

With respect to Mrs. Sullivan's schedule of weekend horse shows, records have only been provided for 1992. A portion of Mrs. Sullivan's attendance at shows that year was for the purpose of competing on Miss Doc Chic, a horse in which petitioners did not retain any possibility of profit. Their prize stallion Colonel Rey Lew, on which their argument of profit motivation is staked, was being ridden in competition by someone else in 1992.

Nevertheless, even if we accept that Mrs. Sullivan traveled to an extensive number of weekend horse shows that year and provided the manual labor required to care for the horses kept on petitioners' premises, we have some difficulty with petitioners' argument that Mrs. Sullivan's time and effort were too extensive to be other than profit-oriented. The regulations effectively provide that time and effort are somewhat discounted as a factor when the activity has substantial recreational aspects. Keeping

---

[7] Petitioners exaggerate somewhat the labor expended by Mrs. Sullivan. While petitioners on brief repeatedly invite us to contemplate the rigors of cleaning stables, etc., for seven, or seven to nine, horses, the record demonstrates that in 1992, petitioners owned six horses, two of which were kept at Mr. Hightower's farm. The record further reveals that an individual was compensated during 1992 to exercise at various times two of the four horses kept on petitioners' premises. Nonetheless, we accept that Mrs. Sullivan provided significant manual labor in caring for the horses kept on petitioners' premises.

and showing horses has recreational aspects, in particular for someone with a demonstrated, long-term interest in horses, such as Mrs. Sullivan. Whether her schedule of horse shows was too arduous to constitute recreation requires a highly subjective determination. The regulations address this problem by providing for some discounting of time and effort where recreational elements are inherent in the activity, which we shall do. In addition, the unpleasant tasks associated with caring for horses are required regardless of whether the activity is pursued as a hobby or business. Although we believe that Mrs. Sullivan put considerable time and effort into petitioners' horse-related activities, this factor is not dispositive.

Expectation That Assets May Appreciate

An expectation that assets used in the activity will appreciate in value may indicate a profit objective. Sec. 1.183-2(b)(4), Income Tax Regs. Petitioners argue that the appreciation in value of their horses,[8] which they expect to occur as a result of astute breeding decisions and arduous promotion, demonstrates their profit motive notwithstanding years of operating losses. The regulations further explain that a profit motive may be inferred where there are no operating profits, so long as the appreciation in value of the activity's

_____

[8] There is no evidence that petitioners' land or other assets besides horses will appreciate in value.

assets exceeds the operating losses. Id. The appreciation in value must be sufficient, however, to recoup the accumulated losses of prior years. Golanty v. Commissioner, supra at 427-428; Bessenyey v. Commissioner, 45 T.C. at 274; Dodge v. Commissioner, supra; Taras v. Commissioner, T.C. Memo. 1997-553.

Petitioners incurred operating losses in 23 of the 26 years in which they have been engaged in their horse-related activities. For 16 of the loss years, the amount of the loss is not available. For the remaining 7 loss years, which are the most recent 7 years through 1995, accumulated losses total $279,270. Even accepting arguendo petitioners' own estimates of the value of their horses in 1996, such estimates are in a range of $170,000 to $222,500. Thus the appreciated value of petitioners' horses, by their own estimate, does not recoup the losses of the last 7 years, let alone the accumulated losses of the other 16 loss years. Nor do we think there is reason to believe that future appreciation will recoup petitioners' losses. Petitioners estimated that Colonel Rey Lew, their current prize stallion, was worth $100,000 to $150,000 in 1996, and they offered speculation that he had tremendous potential yet to be realized. We are not persuaded by such speculation. The horse has been old enough to compete since 1989 and has achieved significant success in both professional and nonprofessional competition since that time. As distinguished from the situation

with Docs Fancy Feat, petitioners have not cited any mishaps that have interfered with Colonel Rey Lew's career.  Petitioners have failed to demonstrate how additional time in competition is likely to change Colonel Rey Lew's value dramatically.  As to petitioners' contention that Colonel Rey Lew's value will rise if his offspring are successful, we note that petitioners at trial were not even certain of the number of his offspring.  Beyond bare speculation, petitioners have failed to show that Colonel Rey Lew's value is likely to appreciate dramatically beyond their current estimate.  While their current estimate represents substantial appreciation, it falls short of recouping their losses.  As a result, the anticipated appreciation in value of petitioners' assets is insufficient to create an inference of profit motive.  Golanty v. Commissioner, 72 T.C. 411, 427-428 (1979); cf. Dodge v. Commissioner, T.C. Memo. 1998-89; Taras v. Commissioner, supra.

Past Success in Similar or Dissimilar Activities

A taxpayer's past success in similar or dissimilar activities is relevant in determining profit motive.  Sec. 1.183-2(b)(5), Income Tax Regs.

It has been stipulated that in 1992 petitioners' horse-related activity was predominantly operated by Mrs. Sullivan, and that Mr. Sullivan worked 80 to 100 hours per week in his job as an investment manager.  Given the demands of Mr. Sullivan's job

and his testimony that he only examined the records of their horse-related activities when he prepared the couple's tax returns, we find his involvement in the activities was quite limited. Thus Mr. Sullivan's success as an investment manager has no significant bearing on the assessment of the horse-related activity. Cf. Surridge v. Commissioner, T.C. Memo. 1998-304. There is no evidence that Mrs. Sullivan has been involved in other profit-seeking activities prior to or during her operation of petitioners' horse-related activity.

The Activity's History of Income and Losses

An activity's history of income or loss may reflect whether the taxpayer has a profit motive. Sec. 1.183-2(b)(6), Income Tax Regs. Unless explained by customary business risks or unforeseen or fortuitous circumstances beyond the taxpayer's control, a record of continuous losses beyond the period customarily required to attain profitability may indicate that the activity is not engaged in for profit. Id.

Given petitioners' extraordinary history of losses, and their efforts to account for it, this factor is central to this case. Petitioners have reported losses from their horse-related activities for 23 of the 26 years in which they have been engaged therein. The last profitable year was 1982. Prior to 1989, there were 16 loss years and 3 income years. The amount of loss in each pre-1989 loss year is not available; the parties have

merely stipulated that losses were reported in those years.[9]  The
3 income years were 1972, 1981, and 1982, in which net income was
$985, $7,336, and $11,742, respectively.  For the post-1988 loss
years (1989-95), the yearly loss amounts ranged from
approximately $32,000 to approximately $51,000, with an average
annual loss of approximately $40,000 during these years.

To the extent petitioners seek to account for this
extraordinary record of losses, they emphasize a series of
unforeseen mishaps in the 1980's as well as what they effectively
contend is a lengthy "startup" period in realizing a cutting
horse's full value.  Given the significance of these losses, we
will carefully evaluate petitioners' explanations.

From 1969 through 1980, petitioners experienced 11 years of
losses and 1 year (1972) in which they realized a gain of $985.
Although petitioners' testimony and argument sought primarily to
account for their losses since 1982, they did experience some
unforeseen adverse events in the 1970's.[10]  In any event, this

---

[9] Petitioners produced return information for income, but
not loss, years prior to 1989.  Given their production of return
information for income years going back to 1972, we believe
return information for loss years prior to 1989 was also
available to petitioners.  They have in any event offered no
explanation for its absence.  Given their failure to produce
return information for loss years prior to 1989, we presume such
evidence would be unfavorable to petitioners if produced.
Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165
(1946), affd. 162 F.2d 513 (10th Cir. 1947).

[10] Petitioners testified that a promising stallion they
(continued...)

initial string of losses may qualify as a "startup" period, which suggests that later periods of losses may not so qualify.

After two profitable years in 1981 and 1982, petitioners realized losses in every year from 1983 through 1995. Petitioners' efforts to account for this period center on the careers of two prize stallions, Docs Fancy Feat and Colonel Rey Lew.

Petitioners attempt to account for roughly the first half of these losses by citing a series of mishaps and bad luck they encountered with Docs Fancy Feat. Docs Fancy Feat was born in 1976 and was from respected bloodlines. He showed great promise as a 3-year-old, missing by a fraction of a point the finals of the Futurity competition for 3-year-olds in 1979, while being ridden by Mr. Hightower. Nevertheless Docs Fancy Feat never realized his true potential to become quite valuable, according to petitioners, because of a series of problems. First, Mrs. Sullivan became pregnant in 1981 and did not ride Docs Fancy Feat in competition in that year or 1982. Due to Mrs. Sullivan's condition, Docs Fancy Feat was sent in August 1981 to a trainer in Arizona, who wished to ride him in competition. However, Docs Fancy Feat suffered colic from the trainer's feeding practices

---

[10](...continued)
purchased in 1969 was injured and had to be euthanized, and a superior mare suffered a nonfatal injury and had difficulties delivering a live foal in the mid-1970's.

and had to be returned to petitioners in December 1981. According to petitioners, it then took nearly a year to reverse certain undesirable training that Docs Fancy Feat had received in Arizona. Mrs. Sullivan then suffered two different ankle injuries, each precluding riding for 6 months, sometime during the period between late 1982 and the end of 1985, although petitioners' testimony is too vague to pinpoint the time with any precision. Docs Fancy Feat suffered a leg injury in 1987, was required to avoid competition for an extended period, and then reinjured the leg in 1988, becoming permanently crippled.

Petitioners' explanations are not entirely convincing. Mrs. Sullivan's pregnancy, Docs Fancy Feat's unfortunate episode in Arizona, and his retraining took place during 1981 and 1982. These were the 2 years in which petitioners earned significant profits. With Mrs. Sullivan unable to ride and Docs Fancy Feat experiencing remedial training, how did they do so? The record does not disclose. Moving to 1983 through 1985, if Mrs. Sullivan's ability to ride was interrupted for two 6-month periods, did petitioners seek another rider for Docs Fancy Feat, as they did for the Futurity competition in 1979, and attempted in 1981? According to the record, there was nothing wrong with Docs Fancy Feat from 1983, when he was 7, until sometime in 1987, when he was 10, and yet the horse generated no profits during

that period.[11]  While it would appear that petitioners experienced some unforeseen circumstances during the 1980's that hampered profitability, we do not believe that the problems cited by petitioners can entirely account for the losses between 1983 and 1987.

Other than a failed effort to lease Docs Fancy Feat for breeding in 1991 or 1992, petitioners cite no mishaps or other unforeseen circumstances that interfered with the profitability of their activity subsequent to his crippling injury in 1988. Although they argue that the passive loss provisions of the Tax Reform Act of 1986 (1986 Act), Pub. L. 99-514, sec. 501, 100 Stat. 2233, had a depressive impact on horse prices, we do not believe any impact from the 1986 Act constitutes an unforeseeable circumstance into the early 1990's, particularly in the absence of any post-1986 changes by petitioners in operating methods to improve profitability.  The only significant change, namely, the decision to switch bloodlines, occurred in 1985.

To account for their losses from the late 1980's through 1995, petitioners cite the career of a second prize stallion, Colonel Rey Lew.  Petitioners cite no mishaps with respect to Colonel Rey Lew; they appear to rely instead on the lengthy period of development for a champion cutting horse stallion.

---

[11] Mr. Sullivan testified that he was offered $1.25 million for Docs Fancy Feat in 1985 by an offeror whose credit references were negative.  There is no evidence to corroborate this claim.

Petitioners testified that the value of a cutting horse is established through conformance, proficiency in competition and, for stallions, through demonstrated capacity to pass along their conformance and skills to offspring. According to petitioners, training of a cutting horse begins between ages 2 and 3, competition begins at age 3, and demonstrating proficiency in competition can entail extensive "campaigning" at weekend events. Petitioners generally did not breed their horses until they were at least 4 or 5 years old, although Colonel Rey Lew was bred as early as age 3.[12] Given petitioners' contention that a stallion's offspring's performance affects his value, the upshot of their argument is that the value of a cutting horse stallion may not begin to emerge until sometime after 7 or 8 years of age.

Colonel Rey Lew was born in 1986 and was old enough to commence competition in 1989. The record indicates that Mr. Hightower rode Colonel Rey Lew in professional competition in 1992, and Mrs. Sullivan rode him in nonprofessional competition in 1994. Nevertheless, petitioners' losses have not abated as Colonel Rey Lew has reached full maturity. From 1992 through 1995, when Colonel Rey Lew was 6 through 9 years old, petitioners' losses were never less than $33,500 per year.

---

[12] Although the parties have stipulated that petitioners do not breed their horses until they are at least 4 or 5 years old, the stipulated exhibits in this case include Colonel Rey Lew's breeding records, which document that he was bred in 1989, when he was 3 years old.

Colonel Rey Lew has been bred only 3 to 4 times per year since 1992[13] and his breeding fee in 1992 was $500. Notwithstanding petitioners' contention that a cutting horse stallion's full value depends upon the success of his offspring, at trial they were uncertain of the total number of Colonel Rey Lew's offspring and were familiar with only seven or eight of such offspring. Thus it would appear either that petitioners have not been businesslike in monitoring Colonel Rey Lew's value, or the performance of offspring is not as important as petitioners argue, which suggests a shorter development period. In any event, petitioners estimated Colonel Rey Lew's value at the time of trial, when he was a 10-year-old, as between $100,000 and $150,000. Although petitioners offered much speculation at trial that Colonel Rey Lew would continue to grow in value, we do not believe the evidence provides any basis to believe that the horse's value will increase dramatically in future years. He has already been "campaigned" extensively in professional and nonprofessional classes, has been bred, and, according to petitioners, has produced some offspring of promise. Thus we believe he has completed any fair approximation of a development period. Yet even petitioners' estimate of his value, though

---

[13] Petitioners and Mr. Hightower testified that extensive breeding interferes with competition, which may explain less breeding in 1992 and 1994, years in which the record indicates that Colonel Rey Lew competed extensively. However, no such explanation exists for 1993 or 1995.

substantial, falls far short of the accumulated losses of their horse-related activities. Their cumulative losses during the period 1989-95, the years in which Colonel Rey Lew has been old enough to compete, total $279,270. With losses averaging $40,000 annually over the last 7 years, we are not persuaded that petitioners have a realistic prospect of recouping their losses in the future or, based on this record, much prospect of even stemming annual losses.

Petitioners appear to argue that their 23 years of losses can be attributed to a startup period in the 1970's, a period of mishaps in the 1980's involving Docs Fancy Feat, and the resumption of a new startup period with Colonel Rey Lew commencing in the late 1980's which will eventually produce profits. By this logic, if Colonel Rey Lew were injured, petitioners could begin anew with another horse and incur losses for another decade without creating an inference that a profit motive was lacking. We do not believe that petitioners have satisfactorily accounted for their history of substantial losses. Losses in 23 of 26 years, that can only partially be attributed to unforeseen circumstances, create a strong inference that an activity was not engaged in for profit. Golanty v. Commissioner, 72 T.C. at 427. Petitioners' expressed intention to continue their activities in the face of these losses reinforces the inference. Cf. Engdahl v. Commissioner, 72 T.C. at 669

(taxpayers' decision to terminate consistently unprofitable horse operation indicative of profit motive).

Amount of Occasional Profits

The amount of any occasional profits, if large in relation to losses incurred or the taxpayer's investment, may indicate a profit motive.  Sec. 1.183-2(b)(7), Income Tax Regs.  The possibility of a substantial profit in a highly speculative venture may indicate a profit motive even where profits are occasional and small or nonexistent.  Id.  Petitioners' 3 profit years generated income totaling $20,063, which is small in relation to the reported losses, the total amount of which is unknown but since 1989 totaled $279,270.  As noted, petitioners offer speculation concerning the value that Colonel Rey Lew, their current prize stallion, may reach, but we do not believe that the record provides any basis to believe that the horse's value will increase dramatically in the future.  Thus petitioners have not shown any likelihood of a large profit in the future that will recoup the losses they have incurred and continue to incur.

Taxpayer's Financial Status

Substantial income from sources other than the activity, particularly if the losses from the activity generate substantial tax benefits, may indicate that the activity is not engaged in for profit, especially if there are personal or recreational

elements involved.  Sec. 1.183-2(b)(8), Income Tax Regs.

Mr. Sullivan's earnings from his employment as an investment manager were $108,750 in 1992 and never less than $90,000 annually from 1989 through 1995.  Clearly, Mr. Sullivan's employment income allowed petitioners to sustain annual losses from their horse-related activities averaging $40,000 during these years.  Deducting these losses significantly reduced the after-tax cost of such activities to petitioners.  Cf. Golanty v. Commissioner, supra at 429; Osteen v. Commissioner, T.C. Memo. 1993-519.  When combined with the recreational elements present for Mrs. Sullivan, we believe the after-tax economics of petitioners' horse-related activities support an inference that they were not engaged in for profit.

Personal Pleasure or Recreation

The existence of recreation elements in the activity may indicate the activity is not engaged in for profit; conversely, where an activity lacks any appeal other than profit, a profit motivation may be thereby indicated.  Sec. 1.183-2(b)(9), Income Tax Regs.

The record in this case amply supports a finding that Mrs. Sullivan's recreational objectives were a significant component of petitioners' horse-related activities.  As noted, Mrs. Sullivan has been actively pursuing an interest in horses since she was 14, rode while in high school and college, and after

college she and Mr. Sullivan bought back the horse she had ridden during high school. More recent evidence of the importance to Mrs. Sullivan of personally competing in cutting horse competitions occurred in 1992, when petitioners engaged in an essentially noneconomic transaction of contracting for the purchase and sale-back of a horse for a nominal price so that Mrs. Sullivan would have a mount for cutting horse competition while their prize stallion was being ridden by Mr. Hightower.

Conclusion

The most compelling factor in this case is the extent of petitioners' history of losses--23 of 26 years. For all years in which information is available, those losses were substantial, averaging $40,000 annually. Petitioners' attempts to account for losses over this lengthy period are unpersuasive. Also striking is the absence of any significant attempt since 1985 to modify methods of operation to improve profitability, even though losses have been continuous since 1982. The extent of petitioners' losses and their complacency therein outweigh any unforeseen circumstances cited by petitioners, the time and effort expended by Mrs. Sullivan, and any business purpose that may be evidenced by their keeping stallions rather than only mares or geldings. When combined with the recreational elements of keeping and showing horses, we believe that petitioners' failure to take action to address losses of this magnitude creates a compelling

inference that petitioners lacked a profit motive.

Petitioners cite <u>Burrow v. Commissioner</u>, T.C. Memo. 1990-621, in support of their position, but that case is readily distinguishable. <u>Burrow</u> was concerned with the <u>first</u> 4 years of losses in a horse breeding operation, not 23 years out of 26. Moreover, in <u>Burrow</u> receipts for years 5 through 7 of the operation had increased dramatically over the first 4 years, providing evidence that the initial losses would not persist. We concluded that because the losses were in the early period of the activity, they were not evidence of lack of profit intent. The patent difference in petitioners' loss history distinguishes <u>Burrow</u>.

For the foregoing reasons, petitioners have failed to show that they entered into and continued their horse-related activities with the actual and honest objective of making a profit. <u>Dreicer v. Commissioner</u>, 78 T.C. 642 (1982); <u>Golanty v. Commissioner</u>, <u>supra</u>. Likewise we believe they have failed to show that their horse-related activities were engaged in with the "primary" purpose of earning a profit. Cf. <u>Westbrook v. Commissioner</u>, 68 F.3d 868 (5th Cir. 1995).

To reflect the foregoing,

<u>Decision will be entered for</u> <u>respondent</u>.