T.C. Memo. 2003-233

UNITED STATES TAX COURT

MICHAEL G. BUNNEY, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 2081-02.                    Filed August 4, 2003.

<u>John Alan Cohan</u>, for petitioner.

<u>Lorraine Y. Wu</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

COHEN, <u>Judge</u>:  Respondent determined deficiencies in petitioner's Federal income taxes and an addition to tax as follows:

|       |            | Addition to Tax |
| Year  | Deficiency | Sec. 6651(a)(1) |
|-------|------------|-----------------|
| 1997  | $19,780    | --              |
| 1998  | 4,980      | $186.05         |
| 1999  | 21,222     | --              |

The issue for decision is whether petitioner is entitled to deduct claimed losses reported on Schedule F, Profit or Loss from Farming, from his horse activity for the years in issue. Petitioner presented neither evidence nor argument concerning the addition to tax and is thus deemed to have conceded that issue.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. Petitioner resided in La Jolla, California, at the time he filed the petition in this case.

Petitioner received an undergraduate degree in marketing from San Diego State University. He received a master of business administration with a specialization in finance from National University. Petitioner has been employed with several public and privately held companies since he was 21 with positions ranging from sales representative to chief operating officer and executive vice president. Petitioner spent 3 years

of active duty in the Navy and 23 years in the Naval Reserves, retiring at the rank of captain. Petitioner has taught courses in marketing, sales management, business planning, small business management, computer science, aeronautics, and accounting at various colleges in southern California.

Petitioner was married prior to the years in issue and was granted a Judgment of Dissolution of the marriage on August 17, 1992. Petitioner's daughter, Sarah A. Bunney, was born on March 13, 1983.

During 1997, petitioner was employed by Time Warner Entertainment and Video Home Sales Services, Inc. Petitioner's wages as reported on his Forms W-2, Wage and Tax Statement, totaled $99,962 in 1997. During 1998, petitioner was employed by Winnebago Software Co. (Winnebago) and Verio-San Diego, Inc. In 1998, petitioner traveled to northern California and Sun Valley, Idaho, as part of his employment. Petitioner's wages as reported on his Forms W-2 totaled $34,739 in 1998. During 1999, petitioner was employed by Winnebago and Pulse Engineering, Inc. As a part of his employment in 1999, petitioner traveled to Singapore; China; Germany; Toronto, Canada; Boston, Massachusetts; New York City, New York; and Eden Prairie, Minnesota. Petitioner's wages as reported on his Forms W-2 totaled $122,385 in 1999.

The Horse Activity

Petitioner began riding horses when he was 8 years old and has always had an interest in horses. In 1990, he developed an interest in "reining" horses, a type of western riding sport. Petitioner engaged in the horse activity under the name M&S Performance Horses (M&S). At the outset, petitioner neither obtained a business license nor filed a fictitious name statement for M&S. During the years in issue, petitioner operated M&S to breed, train, sell, and compete horses.

Petitioner researched the horse activity by going to reining competitions, reading books and publications about the industry, and attending clinics. In 1992, petitioner purchased his first breeding stallion, an American paint horse, Bandits Lucky Doc. On November 23, 1992, petitioner prepared a business plan for M&S, including an income statement and an estimate of revenues and expenses.

Over the next few years, M&S changed direction due to a change in the breeding rules for reining horses. As a result of this change, petitioner began to purchase high-quality broodmares to breed with horses in southern California. Petitioner did not update his business plan to reflect the change in the direction of the business. Petitioner sold Bandits Lucky Doc in 1996.

Petitioner employed Manuel Campos (Campos) as a trainer for 6 years. Campos's business, Manuel Campos Performance Horses

(Campos Horses), had about 15 to 20 full-time clients, with 3 of them engaging in breeding or training as a business. When petitioner first became a client of Campos Horses, he owned a breeding stallion and was breeding paint horses. Petitioner also took riding lessons from Campos.

From January 1, 1995, through December 31, 1996, petitioner was a member of the National Reining Horse Association (Reining Association). Petitioner let his membership expire at the end of 1996. Petitioner was not listed with the Reining Association as a trainer or breeder during the years in issue. In March 2001, petitioner signed a declaration with the Reining Association stating that he had not trained or assisted in training for remuneration for the prior 5 years. Neither petitioner nor M&S was listed with the Reining Association as having collected any lifetime earnings or points from Reining Association approved shows. Petitioner's daughter, however, has ridden horses in reining competitions in the youth categories. Petitioner's daughter earned $4.81 in lifetime earnings and 18.50 points in Reining Association approved shows as of December 31, 2002.

Petitioner's Business Records

Petitioner maintained his business records using the computer software program known as Quicken. Petitioner created with the Quicken program a list of expenses for the years in issue. Petitioner did not maintain records of any bills from

veterinarians for services provided to M&S. Campos Horses occasionally would provide bills and invoices for services performed, as petitioner requested.

Petitioner did not receive or maintain bills of sale or purchase records for all of the horses he owned. Petitioner did not receive or maintain registration documents or transfer reports to establish the number and identities of the horses he owned during the years in issue. Petitioner did not consistently provide a bill of sale to customers who purchased his horses. The retained copies of bills of sale showed either petitioner or petitioner and his daughter as the sellers.

Petitioner kept advertising and promotional materials on his computer. Petitioner prepared flyers and business cards on his computer advertising Bandits Lucky Doc for breeding. Of the advertisements that petitioner kept, none of them listed M&S or petitioner as the seller or breeder of the horse advertised. In 2000, petitioner used the name "Three Colts West Performance Horses" to promote a horse on a flyer. In 2001, petitioner placed three advertisements in Performance Horse Magazine under his name without reference to M&S.

Petitioner distributed business cards at competitions and shows in order to advertise Bandits Lucky Doc. M&S did not have stationery with its own name or logo. Instead, almost all correspondence was prepared under petitioner's name or under

petitioner's and petitioner's daughter's names.  Several letters were prepared under the heading of "Olympic Equine Enterprises" or "Three Colts West Performance Horses".  Petitioner did not retain correspondence sent to M&S from potential clients or other third parties.

Until 1996, petitioner insured Bandits Lucky Doc.  Petitioner did not insure any of the horses that he owned during the years in issue.  In 1996, petitioner prepared an inventory of some of the equipment used by M&S in order to have the equipment covered under his homeowner's insurance policy.  Some of the equipment was stored at an offsite trainer's facility.

Petitioner did not have a dedicated telephone line for M&S and instead used a pager, a cellular telephone, and his home telephone line.  Petitioner occasionally used his employers' telephone numbers for M&S.  In 2000, petitioner opened a dedicated bank account for M&S with Union Bank of California.  On March 23, 2000, petitioner filed a fictitious business name statement for M&S.

On May 15, 1996, in connection with custody and child support proceedings, petitioner signed a declaration that was filed with the Superior Court of California for the County of San Diego.  In the declaration, petitioner claimed that the losses incurred by M&S should be considered to reduce his income for purposes of calculating child support payments.  Petitioner

made a similar claim regarding losses from a consulting business, The Graham Group (Graham). Petitioner estimated $2,050 in monthly losses from M&S and $525 in monthly losses from Graham.

On October 21, 1999, petitioner filed an Income and Expense Declaration with the Superior Court. Petitioner estimated monthly expenses of $3,482 for his daughter's "pet supplies and associated expenses". On June 16, 2000, petitioner filed a second Income and Expense Declaration estimating monthly expenses of $3,588 for pet supplies for "daughter's horses". On May 15, 2001, petitioner filed a Responsive Declaration to Order to Show Cause or Notice of Motion with the Superior Court. Petitioner stated in the declaration that he paid 100 percent of the expenses related to his daughter's three horses, totaling over $1,600 per month.

Federal Tax Returns

Petitioner filed Forms 1040, U.S. Individual Income Tax Return, for 1997 through 1999. Petitioner listed his occupation on the returns as "Manager: Equine Business". Attached to each of the Forms 1040 was a Schedule F reporting a net farm loss each year for petitioner's horse activity. Petitioner described his horse activity on the Schedules F as "equine breeding, training, and sales".

From 1993 through 2000, petitioner reported the following gross receipts and losses with respect to the horse-related activity:

| Year | Gross Income | Expenses | (Loss) |
|------|-------------|----------|--------|
| 1993 | ($11,000) | $14,380 | ($25,380) |
| 1994 | (10,350) | 40,797 | (51,147) |
| 1995 | (2,125) | 104,738 | (106,863) |
| 1996 | -0- | 80,332 | (80,332) |
| 1997 | (9,000) | 82,065 | (91,065) |
| 1998 | 1,000 | 62,972 | (61,972) |
| 1999 | 2,900 | 94,474 | (91,574) |
| 2000 | 13,700 | 106,550 | (92,850) |
| Total | ($14,875) | $586,308 | ($601,183) |

Petitioner has never realized a profit from the horse activity.

Petitioner filed Form 4868, Application for Automatic Extension of Time to File U.S. Individual Income Tax Return, for 1998, extending the due date for the return until August 15, 1999. Petitioner did not request a further extension of time to file. On August 26, 1999, petitioner filed his return for 1998.

OPINION

At the outset, we note that petitioner's briefs did not comply with Rule 151(e) in that his proposed findings of fact recite testimony from trial and rely on documents that were not admitted into evidence. Thus his briefs are unreliable and unhelpful. The factual assertions not based on evidence will be disregarded.

The Horse Activity

Respondent determined that petitioner's horse activity was not an activity engaged in for profit within the meaning of section 183. Under section 183(a), if an activity is not engaged in for profit, no deductions attributable to the activity shall be allowed except as provided in section 183(b). Section 183(b)(1) allows only those deductions that are not dependent upon a profit objective, such as taxes. Section 183(b)(2) allows the deductions that would be allowable if the activity were engaged in for profit, but only to the extent that gross income attributable to the activity exceeds the deductions permitted by section 183(b)(1). An "activity not engaged in for profit" is defined in section 183(c) as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) or section 212."

Under section 183(d), in the case of an activity consisting in major part of the breeding, training, showing, or racing of horses, if the gross income derived from the activity exceeds the deductions for any 2 of 7 consecutive taxable years, then the activity shall be presumed to be engaged in for profit unless the Commissioner establishes to the contrary. See Golanty v. Commissioner, 72 T.C. 411, 425 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). Because M&S has operated

at a loss since it began in 1992, the presumption does not apply in this case.

The Court of Appeals for the Ninth Circuit, to which an appeal in this case would lie, has held that, for a deduction to be allowed under section 162 or section 212(1) or (2), a taxpayer must establish that he engaged in the activity with the primary, predominant, or principal purpose and intent of realizing an economic profit independent of tax savings. Wolf v. Commissioner, 4 F.3d 709, 713 (9th Cir. 1993), affg. T.C. Memo. 1991-212; Indep. Elec. Supply, Inc. v. Commissioner, 781 F.2d 724, 726 (9th Cir. 1986), affg. Lahr v. Commissioner, T.C. Memo. 1984-472; see Prieto v. Commissioner, T.C. Memo. 2001-266, affd. 59 Fed. Appx. 999 (9th Cir. 2003). The taxpayer's expectation need not be a reasonable one, but the profit objective must be bona fide. Golanty v. Commissioner, supra at 425-426; sec. 1.183-2(a), Income Tax Regs. In determining whether the requisite intention to make a profit exists, greater weight is to be given to the objective facts than to the taxpayer's self-serving characterization of his intent. Indep. Elec. Supply, Inc. v. Commissioner, supra at 726; sec. 1.183-2(a), Income Tax Regs.

Section 1.183-2(b), Income Tax Regs., sets forth a nonexclusive list of factors to be considered in determining whether the taxpayer has the requisite profit objective. The

factors are: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profits, if any, that are earned; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation. These factors are not intended to be exclusive, and no one factor or majority of the factors need be considered determinative. Golanty v. Commissioner, supra at 426-427; sec. 1.183-2(b), Income Tax Regs. In this case, the predominant factors weighing against petitioner are whether petitioner carried on the activity in a businesslike manner, petitioner's history of losses, and the elements of personal pleasure involved. None of the other factors supports his position.

Petitioner argues that he conducted his horse activity in a businesslike manner. Maintaining complete and accurate books and records, conducting the activity in a manner substantially similar to comparable businesses that are profitable, and making changes in operations to adopt new techniques or abandon unprofitable methods are factors that may indicate that a

taxpayer conducted the activity for profit. <u>Engdahl v. Commissioner</u>, 72 T.C. 659, 666-667 (1979); sec. 1.183-2(b)(1), Income Tax Regs.

Petitioner did not maintain accurate and complete books and records for M&S. Petitioner testified that it was not his practice to use bills of sale or purchase agreements when horses changed ownership. The documents that petitioner provided as bills of sale were computer-generated, and petitioner admitted to printing them from his computer hard drive in preparation for trial. Petitioner testified that it was not the general practice in the industry to provide bills of sale and that the important documents were the registration document and transfer report. At the time of trial, however, petitioner was unable to provide registration documents for any horse that he owned, and he did not have copies of transfer reports for any horses that he purchased or sold during the years in issue. Petitioner did not maintain records of the breeding of any mares.

The materials that petitioner provided as evidence of his advertising were also computer-generated and were printed in preparation for trial. Petitioner provided no evidence of original advertisements used by M&S. Petitioner had no record of correspondence from other persons. The correspondence he provided was also computer-generated and was prepared for trial.

Petitioner had no records of bills or invoices for any expenses he incurred on behalf of M&S.  Petitioner provided a list of expenses that was prepared using the Quicken software program.  The expense report was prepared and printed solely for trial.

Petitioner did not maintain records for the purpose of decreasing expenses or increasing profits.  Almost all of petitioner's evidence regarding his record keeping was printed from his computer in preparation for trial.  Petitioner provided no credible evidence of conducting a business of horse breeding, and there is no reliable evidence that he was breeding any horses after selling Bandits Lucky Doc.

A taxpayer's history of income or loss with respect to an activity may indicate the presence or absence of a profit objective.  See Golanty v. Commissioner, 72 T.C. at 426; Kuberski v. Commissioner, T.C. Memo. 2002-200; sec. 1.183-2(b)(6), Income Tax Regs.  The magnitude of the activity's losses in comparison with its revenues may be an indication that the taxpayer did not have a profit objective.  McKeever v. Commissioner, T.C. Memo. 2000-288.  A continuous series of losses during the startup stage will not necessarily be deemed indicative that the activity was not engaged in for profit.  Sec. 1.183-2(b)(6), Income Tax Regs. The cumulative loss, however, should not be of such a magnitude that an overall profit on the entire operation could not possibly

be achieved.  See Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967).

From 1992 until 2000, M&S had cumulative losses totaling $601,183.  Petitioner claims that it takes time to reach a profitable level in a horse breeding business and that M&S was still in the startup phase.  Petitioner has not, however, provided any evidence or plan that he could ever recoup his prior losses or make the business profitable.  Petitioner did not provide any evidence that he changed his business plan in order to make the business profitable.  The magnitude of M&S's continuing losses in comparison to the revenues M&S received negates a profit objective.

Elements of personal pleasure or recreation from an activity may indicate that the activity was not engaged in for profit. Sec. 1.183-2(b)(9), Income Tax Regs.  Petitioner stated in documents filed with the Superior Court that he supported his daughter's interest through the years by providing for the costs of maintaining her horses and paying for riding competitions. Petitioner has provided no credible evidence that he owned any horses other than those used by his daughter for recreational purposes.

Based on the preponderance of the evidence, and particularly the large, recurring, and unlikely to be recouped losses, we

conclude that petitioner's horse activity was not engaged in for profit.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.