T.C. Memo. 1998-89

UNITED STATES TAX COURT

JAMES C. AND VIVIAN C. DODGE, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 18089-96.                    Filed March 2, 1998.

Leonard W. Yelsky, for petitioners.

Herbert W. Linder, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GERBER, Judge:  Respondent, by means of a statutory notice

of deficiency, determined the following income tax deficiencies

and section 6662(a)[1] penalties with respect to petitioners:

Penalty

---

[1]Unless otherwise indicated, all section references are to
the Internal Revenue Code in effect for the years under
consideration, and all Rule references are to this Court's Rules
of Practice and Procedure.

| Year | Deficiency | Sec. 6662 |
|------|-----------|-----------|
| 1991 | $11,543 | $2,165 |
| 1992 | 12,634 | 2,311 |
| 1993 | 12,387 | 2,489 |

After concessions,[2] the following issues remain for our consideration: (1) Whether petitioners' horse-breeding activity during the taxable years 1991, 1992, and 1993 was engaged in for profit; and (2) whether any underpayment of tax is due to either negligence or intentional disregard of rules or regulations, or a substantial understatement of income tax.

FINDINGS OF FACT[3]

At all times relevant to this case petitioners were husband and wife and resided in West Liberty, Ohio. They filed joint Federal income tax returns for all 3 years at issue.

James Dodge (Mr. Dodge) was an attorney and president of Brad Bern Corp. located in Cincinnati, Ohio, during the years at issue. From 1990 through 1993, Mr. Dodge was very active at Brad Bern Corp., working on average 12 hours a day, 4 days a week for the corporation. He lived at petitioners' second home in

---

[2]Respondent disallowed unsubstantiated interest deductions of $5,099 and $7,713 in 1991 and 1992, respectively. In addition, respondent determined that petitioners understated interest income in the amount of $66 in 1991. Since petitioners failed to address either of these issues in their brief, we treat this as a concession by petitioners and find for respondent. Theodore v. Commissioner, 38 T.C. 1011, 1041 (1962).

[3]The stipulation of facts and the attached exhibits are incorporated by this reference.

Cincinnati from Sunday night to Thursday night each week. In West Liberty, Mr. Dodge practiced law and operated a tax preparation business at various times during 1991, 1992, and 1993. During 1992 and 1993, Mr. Dodge worked between 12-20 hours per week in his law practice. Mr. Dodge has prepared income tax returns for and assisted farmers with their accounting and tax returns for more than 20 years.

Vivian Dodge (Mrs. Dodge) operated an accounting office and services business called "Dodge & Hostetler" in which she was a 50-percent general partner. Mrs. Dodge was engaged full time at Dodge & Hostetler during the years at issue. Petitioners also owned and managed three rental properties located in West Liberty during the years at issue. Petitioners' combined gross income, without considering the losses claimed for the horse-breeding activity, was $85,216, $88,391, and $103,659 for the taxable years 1991, 1992, and 1993, respectively.

In 1981 petitioners became interested in starting a horse farm. On August 17, 1981, Mr. Dodge met with James Tischer (Mr. Tischer), a tax specialist, to discuss the deductibility of expenses as losses for tax purposes of their planned horse farm. Mr. Tischer suggested that petitioners maintain separate books and records, and that petitioners prepare a long-term plan for the horse farm.

In 1982, petitioners purchased 14 acres of land approximately 1 mile from their home for $13,000 with the intention of building a horse farm. Petitioners cleared the land of trees and constructed a nine-horse barn, sheds, fences, a driveway, and a well at a total cost of $59,500. In 1992 the farmland and improvements were appraised at $121,000.

Petitioners began their horse activity during 1983 and decided to specialize in the breeding and selling of Arabian horses. At that time, petitioners owned an Arabian horse, Homestead Wiraza, which they had purchased in 1981 for $3,500. Mr. Dodge joined several horse associations and attended clinics and seminars to learn how to show, train, breed, and sell horses. He also paid several thousand dollars for professional horse trainers. Petitioners did not, however, consult with any horse breeders about the best way to minimize expenses and/or run a profitable horse farm, nor did they follow Mr. Tischer's advice to prepare a long-term plan for the horse farm.

In 1983, petitioners purchased Canadian Fury for $30,000. Canadian Fury and Homestead Wiraza were the only broodmares used in petitioners' horse-breeding activity. Petitioners did not maintain a stallion for breeding purposes; instead they paid stud fees to outside breeders. From 1983 through 1996, Canadian Fury and Homestead Wiraza produced eight foals. No foals were born

during the years in issue. Only two of these foals were ever sold. One foal, Jims Joy, was sold for less than $400, and the other foal, Ramses Lady, was sold for $2,500. Petitioners also bought horses, trained them, and hoped to resell them at a profit. From 1983 through 1996, petitioners sold eight such horses. Petitioners did not sell any horses during the years at issue.

In addition to training and breeding horses, petitioners showed their horses at various horse shows in order to advertise their farm and increase sale opportunities. Petitioners did not, however, advertise their horses in trade journals, magazines, newspapers, or other publications during the years 1987 through 1995. Mr. Dodge, his daughter Andrea, or a trainer would show the horses. Andrea Dodge would also show horses in the 4-H Club (a youth organization). Petitioners knew that if a horse was successful in the show ring, the value of the horse and its foals would increase. Canadian Fury was very successful in the show ring, becoming the reserve national champion in 1984.

In 1985, petitioners began raising cattle in addition to horses. Petitioners generally purchased four steers each year. Petitioners would buy the steers, feed them for 8 or 9 months, and then sell them at a fair or over the market to a butcher. In addition, petitioners occasionally boarded horses on their farm.

Petitioners had income from the boarding or stabling of horses of $150 and $250 for the taxable years 1991 and 1993, respectively. No income from boarding or stabling was received for 1992.

The Dodges performed most of the work on the farm. A typical day's work included feeding the horses, putting them out to pasture, cleaning the stalls and the barn area, and returning them to the barn in the evening for a final feeding. Mr. Dodge was in Cincinnati during the week; therefore, Mrs. Dodge and Andrea often split the work between them. In addition to the everyday chores, petitioners would spend time grooming their horses in preparation for shows.

The records kept by petitioners with regard to their horse-breeding activity consisted of canceled checks, invoices, and an itemized list of income and expenses for tax purposes. Petitioners had a single checking account for their horse-breeding activity and personal expenses. No balance sheets were prepared for their horse-breeding activity, nor were financial or break-even analyses prepared or maintained. In addition, petitioners did not maintain individual expenditures for each horse. Petitioners did not separate the expenses incurred from their horse-breeding activity from those incurred for raising steers.

Petitioners did not earn a profit from their horse-breeding activity from 1983 through 1995. Petitioners reported income and expenses with respect to the activity as follows:

| Year | Farm Income | Farm Expenses | Profit or (Loss) |
|------|------------|---------------|------------------|
| 1983 | $530 | $58,033 | ($57,503) |
| 1984 | 1,775 | 75,792 | (74,017) |
| 1985 | 3,105 | 76,912 | (73,807) |
| 1986 | 4,280 | 75,187 | (70,907) |
| 1987 | 10,375 | 66,366 | (55,991) |
| 1988 | 9,850 | 52,879 | (43,029) |
| 1989 | 10,500 | 62,878 | (52,378) |
| 1990 | 2,350 | 53,460 | (51,110) |
| 1991 | 1,890 | 45,540 | (43,650) |
| 1992 | 1,000 | 47,132 | (46,132) |
| 1993 | 1,200 | 45,838 | (44,638) |
| 1994 | --- | 32,848 | (32,848) |
| 1995 | 1,200 | 17,491 | (16,291) |
| Total | 48,055 | 710,536 | (662,301) |

In the notice of deficiency, respondent disallowed the losses claimed for the horse-breeding activity for 1991, 1992, and 1993 finding that it was not engaged in for profit.

OPINION

Issue 1. Section 183

Initially we must decide whether petitioners' horse farm was an activity engaged in for profit. Section 183(a) provides that individual taxpayers will not be allowed deductions that are attributable to an "activity * * * not engaged in for profit". This terminology is defined in section 183(c) as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 [trade or business] or under

paragraph (1) or (2) of section 212 [expenses incurred for the production of income]."  Section 183(b) permits deductions that would be allowable only if the activity were engaged in for profit, but such deductions may be taken only to the extent that any gross income generated from the activity exceeds deductions which are not dependent upon a profit objective (e.g., State and local taxes under section 164).

Although a reasonable expectation of profit is not required, the facts and circumstances must indicate that the taxpayer entered into the activity, or continued the activity, with the actual and honest objective of making a profit. Keanini v. Commissioner, 94 T.C. 41, 46 (1990); Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without published opinion 702 F.2d 1205 (D.C. Cir. 1983); sec. 1.183-2(a), Income Tax Regs.  In making this determination, more weight is accorded to objective facts than to the taxpayer's statement of intent.  Engdahl v. Commissioner, 72 T.C. 659, 666 (1979); sec. 1.183-2(a), Income Tax Regs.  Petitioners bear the burden of proving that they possessed the required profit objective.  Rule 142(a); Dreicer v. Commissioner, supra; Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981).

In determining whether an activity is engaged in for profit, reference is made to objective standards, taking into account all of the facts and circumstances of each case. Sec. 1.183-2(a), Income Tax Regs. The regulations set forth nine criteria normally considered for this purpose. The factors are: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, that are earned; (8) the financial status of the taxpayer; and (9) the presence of elements of personal pleasure or recreation. Sec. 1.183-2(b), Income Tax Regs. None of these factors is determinative, nor is the decision to be made by comparing the number of factors that weigh in the taxpayer's favor with the number that support the Commissioner. Id.

Petitioners argue that they had the requisite profit objective with respect to their horse-breeding activity. Conversely, respondent asserts that the activity was not engaged in for profit. We agree with respondent. Because the parties

argued their respective cases by addressing each of the nine criteria enumerated in the regulations, we follow the same approach in our discussion.

1. Manner in Which the Activity Is Conducted

We begin by examining the manner in which petitioners carried on their horse-breeding activity. The fact that a taxpayer carries on the activity in a businesslike manner and maintains complete and accurate books and records may indicate a profit objective. Sec. 1.183-2(b)(1) Income Tax Regs. In deciding whether the taxpayer has conducted the activity in a businesslike manner, this Court has considered "whether accurate books are kept, whether the activity is conducted in a manner similar to other comparable businesses and whether changes have been attempted in order to make a profit." Ballich v. Commissioner, T.C. Memo. 1978-497.

Petitioners assert that the fact that they kept invoices and receipts for the horse-breeding activity is evidence that they conducted it in a businesslike manner. Although petitioners did keep an itemized list of expenses, petitioners did not prepare any business or profit plans, profit or loss statements, balance sheets, or financial break-even analyses for their horse-breeding activity. While a taxpayer need not maintain a sophisticated cost accounting system, the taxpayer should keep records that

enable the taxpayer to make informed business decisions. Burger v. Commissioner, 809 F.2d 355, 359 (7th Cir. 1987), affg. T.C. Memo. 1985-523; Ballich v. Commissioner, supra.

At trial, Mr. Dodge admitted that there were no records kept that would show the expenditures made with respect to each individual horse. Without such knowledge, petitioners would have no way of knowing which of their broodmares was producing more profitable foals or which training regimen was successful at increasing the value of the horses. In addition, petitioners did not even separate the expenses incurred from the horse-breeding activity from the expenses incurred from raising steers. The lack of any detailed records as to which activity on the horse farm was profitable is an indication that the horse-breeding activity was not carried on for profit. Ballich v. Commissioner, supra. Apparently, petitioners retained what they thought were the minimum records necessary to prepare their tax returns.

Petitioners did not advertise their operation or the availability of their horses in trade magazines, journals, or other publications. Petitioners argue that they advertised their horses by exhibiting them in horse shows. While we recognize that horse shows may be one method for advertising horses for sale, petitioners' failure to attempt to reach a larger customer

base is not consistent with the behavior of profit-minded individuals.

Perhaps the most important indication of whether or not an activity is being performed in a businesslike manner is whether or not the taxpayer implements some method for controlling losses. Petitioners assert that they did nearly all of their own farm work, prepared and groomed their own horses, and hauled their own horses to shows, all in an effort to minimize expenses. However, petitioners' failure to produce any significant income was a key factor in their failure to earn a profit. Despite the fact that mares are able to produce one foal a year, petitioners failed to breed their mares with any regularity. Petitioners argue that they raised steers in order to alleviate losses. However, petitioners only purchased and sold four steers a year. Petitioners' typical annual gross receipts from cattle sales was about $2,000. The revenue from the sale of cattle is insignificant when compared to the horse related expenses and was not a significant attempt at reducing losses.

2. Expertise of Petitioners

We next consider the expertise of petitioners with respect to their horse-breeding activity. Sec. 1.183-2(b)(2), Income Tax Regs. A taxpayer's expertise, research, and study of an

activity, as well as his or her consultation with experts, may be indicative of a profit intent.  Id.

Mr. Dodge joined several horse associations, and he attended clinics and seminars to learn how to show, train, breed, and sell horses.  Mr. Dodge also spent thousands of dollars having his horses trained by professional trainers.  Mr. Dodge did become expert and knowledgeable about horses.  His expertise, however, focused on horse breeding and training and not the economics of the activity.  See Burger v. Commissioner, supra.  The fact that Mr. Dodge was skilled in the art of horse breeding is a factor to be considered and does not alone show the horse activity was for profit.  Glenn v. Commissioner, T.C. Memo. 1995-399, affd. without published opinion 103 F.3d 129 (6th Cir. 1996).  Significantly, petitioners did not seek professional or economic advice on the economic aspects of horse breeding.  The only advice that Mr. Dodge sought prior to beginning the horse farm was information on the deductibility of losses for tax purposes.  Mr. Dodge did not analyze or consult with others about the amount of expenses that they were likely to incur.  The failure to seek professional advice is another factor that indicates a lack of profit motive.  Burger v. Commissioner, supra; Ballich v. Commissioner, supra.

3.  Time and Effort Spent in Conducting the Activity

We next consider the time and effort spent by petitioners in conducting their horse-breeding activity.  Sec. 1.183-2(b)(3),

Income Tax Regs. The fact that the taxpayer devotes much of his personal time and effort to carrying on an activity, particularly if the activity does not have substantial personal or recreational aspects, may indicate an intention to derive a profit. Id.

Mrs. Dodge testified regarding the typical amount of work performed by petitioners and their daughter in caring for the horses. The record indicates that Mr. Dodge spent approximately 15 hours per week, and Mrs. Dodge spent approximately 20 hours per week working on the horse farm. Accordingly, petitioners spent significant amounts of time and effort carrying on the horse-breeding activity. However, Mr. Dodge and Andrea Dodge, who are skilled riders, also derived substantial recreational benefit from the time they spent with their horses; therefore, this factor is generally neutralized.

4. Expectation That the Assets Will Appreciate in Value

Another factor is the taxpayers' expectation that the assets used in their breeding activity would increase in value. Sec. 1.183-2(b)(4), Income Tax Regs. Canadian Fury was the reserve national champion in 1984. The value of Canadian Fury and the value of the three foals that she subsequently produced increased as a result of this. In addition, the value of the farm and land increased from $72,500 in 1983 to $121,000 in 1992. Petitioners maintained the belief that the farm would eventually become profitable due to appreciation in the value of the land and

horses.  It is necessary, however, that the objective be to realize a profit on the entire operation.  <u>Bessenyey v. Commissioner</u>, 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967).  This would require future net earnings and appreciation sufficient to recoup the $622,301 of losses reported for 1983 through 1995.  Petitioners failed to produce any evidence to show that their activity had a reasonable chance of recovering losses reported.

5.  <u>Taxpayer's Success in Similar or Dissimilar Activities</u>

We next consider petitioners' prior experience in similar or dissimilar activities.  Sec. 1.183-2(b)(5), Income Tax Regs. Although an activity is unprofitable, the fact that a taxpayer has previously converted similar activities from unprofitable to profitable enterprises may be an indication of a profit motive with respect to the current activity.  <u>Id.</u>

Mrs. Dodge started an accounting and service business in 1991 that generated a profit during the years at issue.  Mr. Dodge operated a successful law practice during the years in issue.  Petitioners had successful business-type experience. Petitioners did not show that their acquired business expertise was used in the horse activity.

6.  <u>The Activity's History of Income and/or Losses</u>

An important consideration is petitioners' history of income and/or losses with respect to their horse-breeding activity. Sec. 1.183-2(b)(6), Income Tax Regs.  Losses continuing beyond

the period customarily required to make an activity profitable, if not explainable, may indicate that the activity is not engaged in for profit.  Id.

Petitioners began their horse farm in 1983.  From 1983 to 1995, petitioners reported total losses of $622,301.  During that same period, petitioners reported gross receipts of $48,055.  The magnitude of the activity's losses in comparison with its revenues is an indication that petitioners did not have a profit motive with respect to the horse farm.  Burger v. Commissioner, supra at 360; Ballich v. Commissioner, supra.

Petitioners assert that the reported losses were typical for the startup stage of a horse farm.  The years at issue were petitioners' 9th, 10th, and 11th years in the horse activity.  Although this Court has recognized that the startup phase of a horse-breeding activity is 5 to 10 years, Engdahl v. Commissioner 72 T.C. at 669, the record reveals that the massive losses were not the result of startup expenses of a horse-breeding enterprise.  Rather, the losses, in large part, were the result of petitioners' selling only two foals during a period of 12 years.  Additionally, we note that petitioners' subsequent years' losses (1994 and 1995, the 12th and 13th years) confirm the earlier pattern.  We therefore find petitioners' argument that the losses were the result of startup expenses to be without merit.

7.  Amount of Occasional Profits

The amount and frequency of occasional profits earned from the activity may also be indicative of a profit objective. Sec. 1.183-2(b)(7), Income Tax Regs. Petitioners did not report a profit from their horse-breeding activity. See Glenn v. Commissioner, T.C. Memo. 1995-399.

8.  Financial Status of the Taxpayer

We next consider petitioners' financial status. Sec. 1.183-2(b)(8), Income Tax Regs. Substantial income from sources other than the activity, particularly if the activity's losses generated substantial tax benefits, may indicate that the activity is not engaged in for profit. This is especially true where there are personal or recreational elements involved. Id.

Petitioners had combined gross income, excluding the losses from their horse farm, of $85,216, $88,391, and $103,659 in 1991, 1992, and 1993, respectively. We note that petitioners' income was sufficient to enable them to maintain a comfortable standard of living notwithstanding the losses from the horse farm.

9.  Elements of Personal Pleasure

The final factor is the personal pleasure derived by petitioners in conducting their activity. Sec. 1.183-2(b)(9), Income Tax Regs. The mere fact that a taxpayer derives personal pleasure from a particular activity does not, per se, show a lack of profit motive. The presence of personal motives may, however,

indicate that the activity is not engaged in for profit.  This is especially true when there are recreational elements involved. Id.

Mr. Dodge and his daughter were avid riders, and they competed in horse shows.  Andrea would also show horses in the 4-H Club.  Petitioners derived personal pleasure from their horse activity.  As has been stated with respect to this factor:

> Unquestionably, an enterprise is no less a "business" because the entrepreneur gets satisfaction from his work; however, where the possibility for profit is small (given all the other factors) and the possibility for gratification is substantial, it is clear that the latter possibility constitutes the primary motivation for the activity.  * * *  [Burger v. Commissioner, T.C. Memo. 1985-523; fn. ref. omitted.]

Considering all of the facts and circumstances, we find that petitioners have failed to prove that their horse-breeding activity was engaged in for profit.

Issue 2.  Accuracy-Related Penalty Under Section 6662

Respondent also determined that petitioners were negligent and liable for penalties under section 6662(a) and (b)(1) for each of the years because they claimed losses from the horse-breeding activity.  Section 6662(a) and (b)(1) imposes an accuracy-related penalty equal to 20 percent of the portion of an underpayment that is attributable to negligence or disregard of rules or regulations.  We find that petitioners were negligent in claiming deductions for their horse-breeding activity.[4]

---

[4]Respondent also determined that petitioners were liable for a sec. 6662(b)(2) penalty because their underpayment was

(continued...)

    In determining whether petitioners were negligent in the preparation of their returns, we take into account petitioner Mr. Dodge's legal and tax experience.  Mr. Dodge prepared 75-100 farm tax returns a year.  Attorneys who specialize in taxation are held to a higher standard of care.  <u>Tippin v. Commissioner</u>, 104 T.C. 518, 534 (1995).  Additionally, the size of the tax losses claimed by petitioners in relation to the revenue earned from the horse-breeding activity, combined with the substantial enjoyment that petitioners derived from the activity, created a situation that was "too good to be true" within the meaning of section 1.6662-3(b)(1)(ii), Income Tax Regs.  Accordingly, petitioners are liable for the section 6662(a) penalties.

    To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155.</u>

---

    [4](...continued) substantial.  As a result of our decision with respect to the negligence penalty, we need not address this issue.