T.C. Memo. 2010-164


UNITED STATES TAX COURT


LINDA K. BETTS, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 22033-07.                    Filed July 27, 2010.


     R determined deficiencies in P's 2003, 2004, and
2005 Federal income tax.  P and R dispute whether P is
entitled to business expense deductions in excess of
the gross income from her horse activities.

     <u>Held</u>:  P is not entitled to the excess business
expense deductions.


<u>Richard W. Craigo</u>, for petitioner.

<u>Miles D. Friedman</u> and <u>Robert H. Berman</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

WHERRY, Judge:  This case is before the Court on a petition for redetermination of Federal income tax deficiencies that respondent determined for petitioner's 2003, 2004, and 2005 tax years in the amounts of $7,389, $7,372, and $5,923, respectively. Respondent issued petitioner a notice of deficiency on September 7, 2007.  Petitioner then filed a timely petition with this Court.  A trial was held on December 4, 2008, in Los Angeles, California.

Respondent concedes that petitioner has substantiated all of her claimed expenses for all 3 years at issue.  The issue for decision is whether petitioner is entitled to deductions arising from her horse activities claimed on her Schedules C, Profit or Loss From Business, to the extent they exceed her gross income from those activities.  More specifically, the issue is whether petitioner was engaged in her horse activities for profit.  See sec. 183.[1]

FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts and the accompanying exhibits are hereby incorporated by reference into our findings.  Petitioner was single and filed

---

[1]Except as otherwise indicated, all section references are to the Internal Revenue Code of 1986, as amended and in effect for the tax years at issue.

Forms 1040, U.S. Individual Income Tax Return, for the taxable years at issue.  Petitioner resided in California when she filed her petition.

During the years at issue petitioner worked full time designing and selling packaging materials for the cosmetic and pharmaceutical industries primarily out of her home in California.  During those years she earned $91,664, $90,129, and $88,631 from that job.

Petitioner has an affinity for horses and enjoys riding and competing in horse-related activities.  Petitioner began riding horses when she was 9 years old and started showing them when she was in her teens; except for a few years in college, she has been involved with horses ever since.  Given her "circle of friends in the horse industry", her horse business activities serve as a "social outlet".

During the years at issue petitioner was a member of the following organizations:  United States Equestrian Foundation, United States Dressage Federation, United States Eventing Association, and the California Dressage Society.[2]  She subscribed to periodicals concerning show horses, some of which

---

[2]"Dressage" is a French word for "training".  Its "purpose is to develop the horse's natural athletic ability and willingness to work, making him calm, supple and attentive to his rider."  United States Dressage Federation, http://www.usdf.org/about/about-dressage/index.asp (last visited July 15, 2010).

she received as part of her memberships in those organizations. Petitioner also read books on horses, watched several DVDs on the subject of horses, and attended seminars and underwent testing as part of her education for becoming a dressage judge. During this time she also volunteered with Reins in Fallbrook, a horse-related organization for "kids that are developmentally disabled". Petitioner's developmentally challenged teenage daughter participated in the organization. During the years at issue petitioner lived with her daughter on the 3-acre ranch she purchased in 1995 for $274,000. Petitioner conducted her horse activities, described below, primarily on this ranch.

Petitioner's first horse business began in 1992 and lasted through 1997. Petitioner engaged in this activity under the name of L & L Farms and used business cards and stationery bearing that name. During the years of this breeding, training, and selling activity, petitioner purchased a mare and bred her twice before she became too old. She also tried to resell a dressage horse but was unable to do so because the horse suffered an injury.

On her Schedules C attached to her 1996 and 1997 Forms 1040 petitioner listed "DRESSAGE SHOW AND SALE" as her principal business or profession. She reported no income for the 2 years but claimed losses of $33,336 and $20,225, respectively. Respondent examined petitioner's 1996 and 1997 Federal income tax

returns but made no adjustments to them. In 1997 petitioner ceased those activities but remained on the ranch and continued her involvement with horses, particularly her commendable volunteer work with the therapeutic riding center.

The horse activities in question in this case began in May 2001 when petitioner purchased a 4-year-old gelding named Gallahad for $1,000, a price she negotiated down from the original $15,000 asking price.[3] Gallahad was well bred but not well cared for and it was petitioner's plan to rehabilitate and resell him. At some point shortly after petitioner purchased Gallahad, his behavior allegedly changed. He began, or perhaps continued, "rearing and bucking and spinning". It was at this time that petitioner took Gallahad to several trainers. The first two were not able to help; but then she contacted Natalie Rooney Pitts (Ms. Pitts), who was able to resolve the problem.

Petitioner hired Ms. Pitts because of her reputation as a "pretty tough rider" who was "able to take on troubled horses and be successful". Ms. Pitts has been an equestrian professional for 15 years and is a certified instructor, a licensed dressage

---

[3]Petitioner maintains that she engaged successfully in two or three distinct businesses that carried on different activities. She testified that her business from 1992 to 1997 was horse breeding, training, and selling, whereas the business from 2001 through 2007 was purchasing and reselling horses. We are not persuaded that the latter activity is truly a new and different business. However, whether we characterize it as one does not change the outcome of the case.

judge, and has been awarded the United States Dressage Foundation bronze and silver medal lifetime awards. She is a member of the U.S. equestrian team and rode in the World Cup in 2005 and other prestigious events. Ms. Pitts described Gallahad as "very well bred on both sides for jumping especially", "beautiful", "very well put together", and "a lovely mover". She told petitioner that Gallahad could potentially be worth $100,000. Gallahad performed well in subsequent horse shows but then about 1 year later suffered multiple tendon injuries, developed severe stomach ulcers, and suffered a check ligament injury. These problems were costly and sidelined Gallahad through 2004.

Pursuant to her plan to sell Gallahad, petitioner advertised him for sale in Horse Trader magazine for $12,000 in 2002 and 2003. She raised the price to $20,000 in 2004. She advertised by word of mouth and by posting flyers at horse shows; these methods did not require a significant cash outlay. Taking into account her expenses related to Gallahad, petitioner would not have made a profit even if she had sold the horse at the highest price listed ($20,000) in Horse Trader. Petitioner still owned Gallahad at the time of trial. At that time she also owned 2 other horses, Western Star and Willing Accomplice, both of which were acquired after the tax years at issue.

On her 2001 through 2005 Schedules C, petitioner listed her principal business or profession as "HORSE TRAINING". Petitioner

then changed her manner of tax reporting for her horse activities on her 2006 and 2007 Forms 1040, by substituting for Schedule C, Schedules F, Profit or Loss From Farming, on which she listed her principal product as "HORSE TRAINING". Although the emphasis may have changed, the Court concludes that in fact she had only one business, the horse business, which over the years conducted a number of overlapping and interrelated activities. From 2001 through 2007 petitioner reported on her Federal income tax returns the following amounts of salary income, gross income from her horse activity, expenses from her horse activity, net profit or (loss) from her horse activity, and taxable income.

| Year | Salary Income | Gross Income From Horse Activity | Expenses From Horse Activity | Net Profit or (Loss) From Horse Activity | Taxable Income |
|------|------|------|------|------|------|
| 2001 | $97,507 | -0- | $8,088 | ($8,088) | $45,107 |
| 2002 | 94,364 | -0- | 22,449 | (22,449) | 26,330 |
| 2003 | 91,664 | -0- | 49,631 | (49,631) | -0- |
| 2004 | 90,129 | $6,815 | 49,944 | (43,129) | -0- |
| 2005 | 88,631 | [1]4,035 | 30,123 | (26,088) | 6,323 |
| 2006 | 82,678 | [1]4,035 | 43,087 | (39,052) | -0- |
| 2007 | 41,410 | 150 | 71,807 | (71,657) | -0- |

[1]All of this income was from her instructing activities.

Petitioner spent approximately 40 hours per week on her horse activity during the years at issue. Among other things, she cleaned stalls, fed her horses, purchased and hauled supplies, maintained the fencing and the grounds on her farm,

rode the horses, cleaned and prepared tack, attended appointments with veterinarians and farriers, and went to shows and competed on the weekends--usually 2 shows per month, except for December.

Petitioner used the same name, L & L Farms, for this horse activity as for the activity occurring from 1992 through 1997. She also used the same business card for both activities, with the same telephone number and Internet address. Petitioner maintained a checking account separate from her personal checking account for her horse activities under the name L & L Farms, and that checking account was different from the one used in the prior horse-related activity. Petitioner also kept a separate file for each horse to keep track of "test results sent from shows", "farrier bills", and its "pedigree."

Petitioner's business plan apparently was not prepared until the 2005 tax examination commenced and consisted of little more than a summary of the horse industry; the plan did not determine, even at that late date, what should be done to make the business profitable. For the second half of 2005 petitioner indicated that she planned to do more advertising and sell the horse she had, Gallahad, to recoup some of her losses. Then she would determine whether or not to continue in the sport horse industry. Petitioner did not increase her advertising during that year or in 2006 or 2007 and did not sell Gallahad, but she decided to continue the activity.

Petitioner never made a formal budget for her later horse activity because she "just didn't feel that was necessary for one horse." Petitioner's business plan was to "purchase prospective sport horses that needed developing, some training, and resell them at a much higher price to the amateur and young rider market."

At some point during the years at issue, most likely 2003, petitioner purchased another horse, Laddie, for $10,000. Petitioner sold Laddie in 2004 for approximately $16,000. Given the expenses she paid with respect to Laddie, she did not make a profit on the overall Laddie horse sale activity. During the years at issue petitioner supplemented the income received from the sale of Laddie with "a few thousand dollars" of income she earned from giving riding lessons, putting on clinics, and running "a program to become a judge for dressage." Petitioner used her salary, withdrawals from her savings and retirement accounts, and loans to pay her horse activity expenses.

Petitioner used a Microsoft Excel spreadsheet to track her horse-related income and expenses. Petitioner engaged a professional accountant, Donald Gamble of Premier Business Services, to prepare her Federal income tax returns for 2003, 2004, and 2005.

When petitioner looked at her financial records, she saw a large negative cashflow and continued significant losses in her

horse activity. Petitioner contended that she attempted "cost cutting measures and tried to get a lot of the things down on costs and negotiated with vets on the care of Gallahad and stretching things out a little bit with farriers and so on to try to bring the costs down." But, in fact, petitioner's losses were fairly steady, and her largest claimed loss was in 2007.

Petitioner indicated that she expected to sell Gallahad, for "somewhere in the six figure amount", noting that he was well bred, that his relatives "all were big-time show jumpers", and his "half brother was Gold Fever, who won the gold medal at the 2004 Olympics." Nevertheless, it was obvious to petitioner by at least 2002 that this expectation was unrealistic. She purchased the horse, after it had been exposed on the open market for some time, for only $1,000, and she herself offered to sell Gallahad for as little as $12,000 starting in 2002 and 2003.

Petitioner considered the activity of purchasing, developing, and reselling show horses to be "risky" but worth the risk because "the rewards may be even higher if you hit the jackpot with a really good horse that you can sell for a lot of money." When it came to marketing, petitioner showed her horses herself so she would not have to pay a trainer and because she was trying to sell her horses to amateurs and as an amateur rider herself "it makes it more believable that the horse can actually be ridden by an amateur." Except for a relatively small, elite

group, an amateur rider does not generally ride a horse with a value of six figures.

Ms. Pitts saw petitioner engaged in her business and believed that she was "very hardworking." Ms. Pitts had other clients who carried on horse activities that, according to her, made a profit and operated in essentially the same manner as petitioner's. Ms. Pitts did not advise petitioner to do anything differently and said that she thinks "she's doing a great job." Ms. Pitts indicated that petitioner is "very up on everything that's going on" and that she "actually [depends] on her to help me stay abreast of everything" going on in the industry. She testified that most other owners do not pay attention to the industry at all.

## OPINION

Respondent argued that the expenses related to petitioner's horse activity were not deductible in excess of the gross income because the horse activity was not engaged in for profit within the meaning of section 183.

Section 183(a) generally disallows deductions attributable to activities not engaged in for profit. Section 183(c) defines an "activity not engaged in for profit" as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212."

The Court of Appeals for the Ninth Circuit, to which an appeal in this case would lie absent stipulation to the contrary, has held that an activity is engaged in for profit if the taxpayer's "predominant, primary or principal objective" in engaging in the activity was to realize an economic profit independent of tax savings. Wolf v. Commissioner, 4 F.3d 709, 713 (9th Cir. 1993), affg. T.C. Memo. 1991-212. However, if the investor's primary or principal objective is to make a profit, it is not necessary for the investor to show that his primary objective was reasonable. Sec. 1.183-2(a), Income Tax Regs.

Section 1.183-2(b), Income Tax Regs., sets forth a nonexclusive list of factors to be considered in evaluating a taxpayer's profit objective: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned from the activity; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation. No one factor is necessarily determinative in the evaluation of profit objective, nor is the

number of these factors for or against the taxpayer necessarily determinative. Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); sec. 1.183-2(b), Income Tax Regs. All facts and circumstances with respect to the activity must be taken into account. Sec. 1.183-2(b), Income Tax Regs.

1. The Manner in Which the Taxpayer Carries on the Activity

The fact that the taxpayer carries on the activity in a businesslike manner may indicate that the activity is engaged in for profit. Sec. 1.183-2(b)(1), Income Tax Regs. In this context we consider: (1) Whether the taxpayer maintained complete and accurate books and records for the activity; (2) whether the taxpayer conducted the activity in a manner substantially similar to comparable activities that were profitable; and (3) whether the taxpayer changed operating procedures, adopted new techniques, or abandoned unprofitable methods in a manner consistent with an intent to improve profitability. Giles v. Commissioner, T.C. Memo. 2005-28; sec. 1.183-2(b)(1), Income Tax Regs.

The first inquiry considers whether petitioner maintained complete and accurate books and records of the activity. Petitioner maintained a separate checking account, used business cards, kept an Excel spreadsheet of her income and expenses, and kept a file for each horse. However, there is little evidence

that the books and records were kept for the purpose of "cutting expenses, increasing profits, and evaluating the overall performance of the operation."  See Golanty v. Commissioner, supra at 430.  When asked at trial, petitioner was unable to allocate profits and expenses to the sale of Laddie because she "didn't break it out that Laddie used x amount of food and x amount of shavings and x amount of farrier."  Without such knowledge, petitioner could not have known how profitable the entire operation was.

Petitioner claims to have written a business plan at the beginning of her new activity, but she was unable to present it to the auditing agent.  Petitioner testified that when she purchased Gallahad to start up her second horse activity, her plan was to "purchase prospective sport horses that needed developing, some training, and resell them at a much higher price to the amateur and young rider market."  Petitioner produced a written business plan some time after the activity had already begun and revised it at the request of the auditing agent.[4]  Both of these business plans are devoid of any meaningful financial analysis.  The only "analysis" is a broad summary of the horse industry indicating that there are 9.2 million horses in the

_____

[4]The original business plan indicates that petitioner purchased the ranch 10 years before the plan was drawn up; therefore, this plan was probably written in 2005, before July 28 of that year, the date on which the revised version was submitted to the Internal Revenue Service.

United States and 700,000 in California and that the "amateur market is the fastest growing market * * * These riders are looking for safe, enjoyable mounts that are competitive."

A written business plan is not required if the "business plan was evidenced by * * * actions". <u>Phillips v. Commissioner</u>, T.C. Memo. 1997-128. However, in <u>Phillips</u> the taxpayers knew the amounts of income that would be required to cover their expenses in future years. Although petitioner kept an itemized Excel spreadsheet of the income and expenses of the activity, she did not "prepare any business or profit plans, profit or loss statements, balance sheets, or financial break-even analyses" for her activity. See <u>Dodge v. Commissioner</u>, T.C. Memo. 1998-89, affd. without published opinion 188 F.3d 507 (6th Cir. 1999). Petitioner presented no evidence of a budget or that she knew how much she could spend to maintain Gallahad and still make a profit. She merely testified that she saw a lot of money going out in her horse activities and that she never made a formal budget because it was not "necessary for one horse". Even if petitioner had received $100,000 for Gallahad in 2005, by the end of that year she would have already lost $49,395 (i.e. $149,395 - $100,000) on the horse activities. This favors respondent.

As to the second inquiry, Ms. Pitts in her testimony indicated that she had other clients who carried on horse activities in a manner similar to petitioner's and earned a

profit. But her testimony was not corroborated; documentation of practices in similar activities was not provided.

The third inquiry asks whether petitioner changed operating procedures, adopted new techniques, or abandoned unprofitable methods in a manner consistent with an intent to improve profitability. Petitioner did aggressively negotiate down the purchase price of both horses she purchased; however, this was her practice from the beginning of the second activity and indicates no change in method. Petitioner testified that she began to give riding lessons and put on dressage clinics to supplement her income. The record shows that petitioner has been giving clinics since 2003 but quadrupled the amount of 2003 income from the clinic activity in 2005. This does seem to indicate that she at least updated her operating procedure to increase this income.

Petitioner negotiated down veterinarian bills, and Ms. Pitts noted that petitioner brought her own shavings (the wood chips used as a floor covering and bedding in horse stalls) to horse shows for half the cost. However, petitioner's records indicate that her vet expenses increased from about $4,000 in 2003 to more than $7,000 in 2005, and her shavings expenses decreased from about $560 in 2003 to about $100 in 2005. Some of these minor changes indicate that petitioner wanted to decrease expenses on an activity that was not earning a profit. But we are not

convinced that these changes would have had a material impact on the overall profitability of petitioner's activity or are probative that she conducted the activity with an objective to make a profit. See <u>Golanty v. Commissioner</u>, 72 T.C. at 428.

Respondent asserts that petitioner's minimal advertisement and promotion of the horse activities indicate that the activities were not engaged in for profit. This Court has found that advertising at horse shows, by word of mouth, in print media, and by participation in horse shows may indicate an intent to make a profit. <u>Engdahl v. Commissioner</u>, 72 T.C. 659, 667 (1979). However, in 2005 petitioner spent only $35 on advertising, almost $500 less than in 2004 and 2003. Although this indicates a change in operating procedure, the reduction in the amount expended for advertising is at best ambiguous and may not be consistent with an intent to improve profitability. This favors respondent.

We conclude that petitioner did not carry on the horse activity in a businesslike manner. Therefore, this factor favors respondent.

2. <u>The Expertise of the Taxpayer or Her Advisers</u>

> Preparation for the activity by extensive study of its accepted business, economic, and scientific practices, or consultation with those who are expert therein, may indicate that the taxpayer has a profit motive where the taxpayer carries on the activity in accordance with such practices. * * * [Sec. 1.183-2(b)(2), Income Tax Regs.]

We have no doubt that petitioner is an accomplished horsewoman with an extensive background in riding and showing horses. She has certainly engaged in an extensive study of training, dressage, and horsemanship as evidenced by her collection of books and videos, and her dressage seminars and testing. However, none of the educational materials in the record relate to the economics or business aspects of profitably running a horse activity, and petitioner's background as a lifelong horsewoman is insufficient to indicate a profit objective. See Giles v. Commissioner, T.C. Memo. 2006-15 (discounting the probative value of reference materials that do not relate to the business aspects of the horse activity); and Giles v. Commissioner, T.C. Memo. 2005-28 (same); McKeever v. Commissioner, T.C. Memo. 2000-288.

Before entering into her second activity petitioner consulted Robert Kellerhouse, a rider and competitor who organizes horse shows, Teresa Williams, a horse broker, Elsa Donnell, a dressage trainer, and Axle Steiner, a horse judge who judges the Olympics and "all the high end equestrian sports." Petitioner continued to consult with those individuals after she started her activity about: Issues with training Gallahad, the ups and downs of the market, what horses were being sold for, who was winning equestrian competitions, what people were looking for in horses, and what horses were selling.

The main inquiry is whether petitioner received advice from the experts as to the accepted principles and economics of profitably running a business and not merely the general advice that a horse enthusiast would seek in training and showing horses as a hobby. See Golanty v. Commissioner, 72 T.C. 411 (1979); Chandler v. Commissioner, T.C. Memo 2010-92; Keating v. Commissioner, T.C. Memo. 2007-309, affd. 544 F.3d 900 (8th Cir. 2008); Giles v. Commissioner, T.C. Memo. 2006-15; McKeever v. Commissioner, supra (taxpayers received general advice on showing and promoting horses, but not on how to run a profitable horse business). Other than Ms. Pitts, petitioner's advisers did not testify at trial or otherwise corroborate through evidence such as correspondence or other documentation that they discussed the specifics of profitably running a horse activity with petitioner. When a party has the ability to introduce evidence and does not, we may infer that the evidence would have been unfavorable to that party. Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947).

Ms. Pitts discussed the economic state of the sport horse industry with petitioner and observed petitioner discussing the same with Robert Kellerhouse. Although petitioner's discussions with the above experts may have touched on some information relevant to running a horse activity for profit, the focus was on

the general aspects of training, showing, and selling horses and not on the business aspects of the activity.

We conclude that petitioner has not established that she sought expert advice regarding the business and economic aspects of carrying on her activity for profit; therefore, this factor weighs in favor of respondent.

3.   The Time and Effort Expended by the Taxpayer in Carrying on the Activity

> The fact that the taxpayer devotes much of his personal time and effort to carrying on an activity, particularly if the activity does not have substantial personal or recreational aspects, may indicate an intention to derive a profit.  A taxpayer's withdrawal from another occupation to devote much of his energies to the activity may also be evidence that the activity is engaged in for profit. * * * [Sec. 1.183-2(b)(3), Income Tax Regs.]

Petitioner spent 40 hours per week working on her horse activity.  Ms. Pitts corroborated this testimony, confirming that petitioner spent a minimum of 40 hours per week on the activity. This is a significant amount.  Petitioner's horse activity work included:  Cleaning stalls, feeding horses, maintaining the grounds/fencing, riding horses, cleaning tack, handling animals for the vet or farrier, and competing in shows.  However, the activity also had considerable personal and recreational aspects, even if some of the activities were mundane, arduous, or repugnant.  Petitioner received considerable enjoyment from

riding, owning, and competing with horses.[5]  She went to all-
weekend horse shows and competitions, which she enjoyed and which
took considerable time.  These activities are just as much a part
of a horse hobby as they are a horse business, and there is no
indication of what work she did on her horse activity that was
beyond what she would have done if the activity was a hobby.  See
Giles v. Commissioner, T.C. Memo. 2006-15 ("unpleasant tasks
associated with caring for horses are required regardless of
whether the activity is pursued as a hobby or a business.");
Giles v. Commissioner, T.C. Memo. 2005-28.

    Although we found in Engdahl v. Commissioner, 72 T.C. at
670-671, that "35 to 55 hours per week caring for the horses,
mucking out stalls, and maintaining the horse facilities * * *
could hardly be called pleasurable", the taxpayers in Engdahl did
not themselves ride or personally use the activity's property for
social activities.  In contrast, petitioner received a great deal
of pleasure from riding and acknowledged that she had a circle of

---

[5]Petitioner testified that she never rode "pleasure horses",
and Ms. Pitts testified that she never saw petitioner ride a
pleasure horse.  However, petitioner did not distinguish whether
she meant that she never rode horses for leisure time pleasure or
that she never participated in the discipline of "pleasure
riding".  "Pleasure riding" competitions at horse shows evaluate
horses on manners and suitability of the horse for a relaxed
gait.  The horse is to appear to be a "pleasure" to ride.
Because petitioner is an accomplished horsewoman (and so is Ms.
Pitts), we believe that she may have been referring to the
discipline and not the fact that she never received pleasure from
riding her horses.

friends in the horse industry and that it was a social outlet for her.

Petitioner confirmed her lifelong love of horses and competition. That a business person derives pleasure from his or her work does not necessarily show a lack of a profit objective. See sec. 1.183-2(b)(9), Income Tax Regs.; see also <u>Jackson v. Commissioner</u>, 59 T.C. 312, 317 (1972). Petitioner did spend a significant amount of time on her horse activity; however, because the activity had so many personal and recreational aspects, we find this factor neutral.

4.    <u>The Expectation that Assets Used in the Activity May Appreciate in Value</u>

"A taxpayer's expectation that assets such as land and other tangible property used in an activity may appreciate in value to create an overall profit may indicate that the taxpayer has a profit objective as to that activity." <u>Giles v. Commissioner</u>, T.C. Memo. 2005-28 (quoting sec. 1.183-2(b)(4), Income Tax Regs.).

There is no doubt that petitioner expected her horses to appreciate. Petitioner began her second horse activity after purchasing Gallahad for $1,000 with the plan to "resell * * * [him] at a much higher price". Gallahad was very well bred but he had been neglected. She was able to negotiate the original asking price of $15,000 down to just $1,000 because the owners

wanted to "just get rid of him." Petitioner believed that she would then be able to sell him "somewhere in the six figure amount."

After petitioner purchased Gallahad, he had many physical problems; however, Ms. Pitts testified that Gallahad could still be worth $100,000. The record does not support that testimony but rather shows that petitioner had been unable to sell Gallahad at much lower prices. Although Gallahad did not appreciate nearly as much as petitioner thought he would, we believe that petitioner felt she had bought him for a bargain price and did expect him to appreciate in value.

We are unconvinced by petitioner's argument that her property should be included as part of her horse activity. We do accept that she believed the property would appreciate in value and that it did in fact appreciate. As we have already found, petitioner also expected her horses to appreciate. Petitioner testified that a bank had appraised her property at around $500,000 in 2003, and another appraisal (prepared for a line of credit) indicates that the value was somewhere around $400,000 and $522,600. Petitioner believed her property was worth $675,000 in 2003 and that it was worth somewhere between $700,000 and $850,000 in 2005 based on a valuation by her realtor.

The property also served as petitioner's home and that of her daughter. There is no indication that petitioner expected to

hold the property for sale or to sell it as a profit center of her horse activity. See Rozzano v. Commissioner, T.C. Memo. 2007-177 (The taxpayer began the horse activity subsequent to the purchase of the land, therefore there was no bona fide intention of realizing profits from including the land in the horse activity.).

When there is little economic interrelationship between a horse activity and the holding of the property for appreciation, they cannot be considered the same activity. Boddy v. Commissioner, T.C. Memo. 1984-156 n.6, affd. without published opinion 756 F.2d 884 (11th Cir. 1985). Petitioner may have purchased the land primarily for the purpose of her first horse activity; however, it was also her primary residence, and she remained on the property between her two horse activities. If petitioner's intent to make a profit depended upon the appreciation of her land, then "'the horse farm was an unnecessary economic burden to the holding of the land for appreciation.'" See Purdey v. Commissioner, T.C. Memo. 1989-657 (quoting Boddy v. Commissioner, supra), affd. without published opinion 922 F.2d 833 (3rd Cir. 1990).

Even if we assume that petitioner purchased the property "with the intent to profit from increase in its value," petitioner has not shown that the horse activity actually "reduces the net cost of carrying the land for its appreciation

in value."  See <u>Purdey v. Commissioner</u>, <u>supra</u>; sec. 1.183-1(d)(1), Income Tax Regs.  Farming and holding land will be considered a single activity only "'if the income derived from farming exceeds the deductions attributable to the farming activity which are not directly attributable to the holding of the land'".  <u>Faulkner v. Commissioner</u>, T.C. Memo. 1985-536 n.9 (quoting section 1.183-1(d)(1), Income Tax Regs.).  Petitioner's income never came close to covering the expenses that were related to the horse activity and were not directly related to the holding of the land.[6]

Because Laddie was sold for $6,000 over his purchase price and Gallahad was purchased at a "bargain price", we conclude that petitioner expected the horses involved in the activity to appreciate in value with the potential, although not achieved here, of creating a profit.  This factor weighs in favor of petitioner.

5.  <u>The Success of the Taxpayer in Carrying on Other Similar or Dissimilar Activities</u>

"The fact that the taxpayer has engaged in similar activities in the past and converted them from unprofitable to profitable enterprises may indicate that he is engaged in the

_____

[6]Petitioner's Excel spreadsheets for 2003, 2004, and 2005 list only expenses directly related to the care, show, and sale of horses and do not include any property expenses.  These spreadsheets also include petitioner's income from the horse activity, which is a mere fraction of the listed variable horse-related expenses.

present activity for profit, even though the activity is presently unprofitable." Sec. 1.183-2(b)(5), Income Tax Regs.

Although petitioner has a long history of working with and showing horses, petitioner's first horse activity was unsuccessful. Petitioner reported on Schedule C of her tax returns that she had losses of $33,336 in 1996 and $20,225 in 1997. Petitioner appears to be a successful packaging designer for the pharmaceutical and cosmetics industry; however, the record does not show that she conducted her horse activity in a manner similar to her design business. Giles v. Commissioner, T.C. Memo. 2005-28 (citing Dodge v. Commissioner, T.C. Memo. 1998-89).

Under this factor, petitioner's previous lack of success in carrying on a similar activity favors respondent.

6.   The Taxpayer's History of Income or Losses With Respect to the Activity

> A series of losses during the initial or start-up stage of an activity may not necessarily be an indication that the activity is not engaged in for profit. However, where losses continue to be sustained beyond the period which customarily is necessary to bring the operation to profitable status such continued losses, if not explainable, as due to customary business risks or reverses, may be indicative that the activity is not being engaged in for profit. If losses are sustained because of unforeseen or fortuitous circumstances which are beyond the control of the taxpayer * * * such losses would not be an indication that the activity is not engaged in for profit. * * * Sec. 1.183-2(b)(6), Income Tax Regs.; see also Engdahl v. Commissioner, 72 T.C. at 669 (holding that horse breeding has 5-to 10-year startup stage); Burger v.

Commissioner, T.C. Memo. 1985-523, affd. 809 F.2d 355 (7th Cir. 1987).

For the years at issue petitioner claimed $118,848 in losses. She contends that the years at issue were well within the 5-to 10-year startup stage of her activity and that the losses were in part due to unforeseen problems with Gallahad.

Petitioner argues that the activity beginning in 2001 was distinct from the activity beginning in 1992. Petitioner asserts that because she took a 3-1/2 year hiatus from conducting or reporting any operations and because the first activity consisted primarily of breeding, development, and sale, while the second activity consisted of purchasing, development, and sale, the two activities are different. Petitioner argues that this distinction is important with respect to the presumption under section 183(d) and the allowance of an appropriate startup period for the second activity. Even if petitioner began a new activity in 2001, we are unconvinced that the extensive losses can be explained because the activity was still in its startup phase.

Section 183(d) provides that "If the gross income derived from an activity for 3 or more of the taxable years in the period of 5 consecutive taxable years which ends with the taxable year exceeds the deductions attributable to such activity * * * such activity shall be presumed * * * to be an activity engaged in for profit." This section expands the timeframe so the presumption arises if in 2 of 7 taxable years the gross income exceeds the

deductions for "an activity which consists in major part of the breeding, training, showing, or racing of horses". Id.

If her second activity was truly a new and distinct activity, the years at issue are only the third, fourth, and fifth of the activity. It was possible that petitioner could then have had 2 profitable years before the 7 years were up as of the end of the 2005 tax year. In fact, as of chart above notes, losses were also incurred in 2006 and 2007. Petitioner's main business prospect, Gallahad, had not sold even at prices substantially below $100,000 (the record includes advertisements where petitioner listed Gallahad at $12,000 to $20,000). We are unconvinced that petitioner would have been able to sell Gallahad at a price that would cover her losses. See Boddy v. Commissioner, T.C. Memo. 1984-156 ("'the presence of losses in the formative years of a business * * * is not inconsistent with an intention to achieve a later profitable level of operation, bearing in mind, however, that the goal must be to realize a profit on the entire operation, which presupposes not only future net earnings but also sufficient net earnings to recoup the losses which have meanwhile been sustained in the intervening years'" (quoting Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967), cert. denied 389 U.S. 931 (1967))).

Although petitioner cites numerous cases in which we have allowed lengthy startup periods (5 to 11 years) for horse activities, those cases generally involve horse breeding. See Engdahl v. Commissioner, 72 T.C. 659 (1979); Routon v. Commissioner, T.C. Memo. 2002-7; McKeever v. Commissioner, T.C. Memo. 2000-288; Dodge v. Commissioner, T.C. Memo. 1998-89; Appley v. Commissioner, T.C. Memo. 1979-433. Petitioner, in the years at issue, was not involved in a horse-breeding activity, and she did not present testimony or other evidence at trial with respect to a reasonable startup period for her actual activity. Petitioner asserts that her activity was "essentially a 'one-horse' operation", and the record indicates that she attempted to sell Gallahad relatively soon after purchase. Moreover, there is no indication that she would have made a profit from her activity if the problems affecting Gallahad had not occurred. See Dodge v. Commissioner, supra.

Quoting section 1.183-2(b)(6), Income Tax Regs., petitioner also argues that the losses were "'sustained because of unforeseen or fortuitous circumstances which are beyond the control of the taxpayer'". It is true that there were many problems with Gallahad. While in petitioner's possession, he had a problem, multiple tendon injuries, and ulcers. As unfortunate as these issues are, we do not beleive they were entirely

unforeseeable.  Petitioner purchased this horse for a nominal amount of $1,000 from people who wanted to "just get rid of him."

Even if petitioner was in the startup phase of her second horse activity, the substantial and consistent losses were not attributable to the costs required to start up a business.  Nor were they from unforeseen circumstances.  The losses resulted from her inability to sufficiently control expenses and effectively market and sell the activity's only significant asset and only possible source of profit.  Accordingly, this factor favors respondent.

7.    The Amount of Occasional Profits, If Any, Which Are
      Earned From the Activity

"The amount of profits in relation to the amount of losses incurred, and in relation to the amount of the taxpayer's investment and the value of the assets used in the activity, may provide useful criteria in determining the taxpayer's intent." Sec. 1.183-2(b)(7), Income Tax Regs.  "[A]n opportunity to earn a substantial ultimate profit in a highly speculative venture is ordinarily sufficient to indicate that the activity is engaged in for profit even though losses or only occasional small profits are actually generated."  Id.

Petitioner argues that when she purchased Gallahad and started the activity, she could make a substantial amount of money from the sale of Gallahad.  Yet she and Ms. Pitts also admitted that the sale of horses is a high-risk activity.  We

have held that horse activities are highly speculative ventures, even likening show horses to a wildcat oil well.  Dawson v. Commissioner, T.C. Memo. 1996-417.

Although petitioner has generated no profit from her activity, "A taxpayer's belief that she could one day sell a horse for a substantial amount of revenue and a correspondingly large profit may be indicative of a profit motive if that belief is adequately supported."  See Giles v. Commissioner, T.C. Memo. 2006-15 (citing McKeever v. Commissioner, supra).  When petitioner began her second horse activity, she believed that she could hit the "jackpot" with Gallahad.  We are less certain that this belief reasonably continued through the years at issue.

Petitioner's horse activity generated no profits in the first 4 years of existence; however, show horses are a highly speculative venture, and petitioner initially believed that she could sell Gallahad for a large profit.  We find this factor slightly favors petitioner.

8.   The Financial Status of the Taxpayer

"Substantial income from sources other than the activity (particularly if the losses from the activity generate substantial tax benefits) may indicate that the activity is not engaged in for profit especially if there are personal or recreational elements involved."  Sec. 1.183-2(b)(8), Income Tax Regs.  Petitioner earned substantial income from her product

design business, and the losses from her horse activity resulted in substantial tax benefits. Moreover, petitioner derived great personal pleasure from her activity. During the years at issue petitioner earned an average of $90,000 a year from her product design business which, coupled with the tax benefits she enjoyed, enabled her to fund her profitless horse activity.

Petitioner cites several cases in which the Court found that a taxpayer's investment of unrelated income into the activity was indicative that it was not a mere hobby. See, e.g., Engdahl v. Commissioner, supra at 670; Phillips v. Commissioner, T.C. Memo. 1997-128; Mary v. Commissioner, T.C. Memo. 1989-118; Eisenman v. Commissioner, T.C. Memo. 1988-467; Appley v. Commissioner, supra. In each of those cases, however, the Court found facts and circumstances not present here, including that the taxpayer either derived no personal pleasure or recreation from the activity or derived much less than petitioner does from her activity.

Petitioner did spend a significant amount of money on her horse activity. She also received substantial tax benefits (in fact dropping her taxable income to zero in 2 of the years at issue) and considerable personal pleasure. See McKeever v. Commissioner, T.C. Memo. 2000-288. We are also mindful that as a parent she saw the activity as important to her daughter's development and happiness.

We agree that petitioner expended more money on her horse activity than she could prudently afford given her apparent lack of other independent sources of wealth, divorced status, and dependent daughter. Further, by funding the activity in part with funds from loans, the hoped-for tax savings at issue in this case, and withdrawals from her savings and retirement accounts, she has put herself and her daughter in substantial financial jeopardy. See Helmick v. Commissioner, T.C. Memo. 2009-220. So long as Federal and State combined income tax rates are less than 100 percent, there is no financial "benefit" from losing money. Engdahl v. Commissioner, 72 T.C. at 670. On the basis of these facts petitioner asserts that this was not a hobby. Respondent, focusing on the substantial tax benefits, consistent history of losses, recreational elements, and petitioner's daughter's therapeutic aspects, concludes it was not a for-profit activity. We believe there is some truth to both parties' assertions, but we do not fully accept either party's conclusion. McKeever v. Commissioner, supra. We find this factor is neutral.

9. Elements of Personal Pleasure or Recreation

"The presence of personal motives in carrying on of an activity may indicate that the activity is not engaged in for profit, especially where there are recreational or personal elements involved." Sec. 1.183-2(b)(9), Income Tax Regs. However, "We also note that a business will not be turned into a

hobby merely because the owner finds it pleasurable; suffering has never been made a prerequisite to deductibility." Jackson v. Commissioner, 59 T.C. at 317.

Petitioner loves horses and clearly derives great pleasure from her horse-related activity. She has ridden horses since she was 9 years old and sought to surround herself with horses her entire life.[7] Moreover, her activity is also a social outlet for her, and she believes it has therapeutic benefits for her daughter. See Keating v. Commissioner, T.C. Memo. 2007-309 (citing Montagne v. Commissioner, T.C. Memo. 2004-252, affd. 166 Fed. Appx. 265 (8th Cir. 2006)) (particularly attaching relevance to whether the taxpayer or a member of the taxpayer's family rides the horses); Bunney v. Commissioner, T.C. 2003-233 (the parent supported his daughter's interest in horses.). We note that, "'an enterprise is no less a "business" because the entrepreneur gets satisfaction from his work; however, where the possibility for profit is small (given all the other factors) and the possibility for gratification is substantial, it is clear that the latter possibility constitutes the primary motivation for the activity.'" Dodge v. Commissioner, T.C. Memo. 1998-89 (quoting Burger v. Commissioner, T.C. Memo. 1985-523).

---

[7]Again petitioner argues that she never rode "pleasure horses." We do not take this to mean, nor do we find, that she received no pleasure from riding horses. See supra note 5.

Petitioner's horse activity clearly involved substantial elements of personal pleasure and recreation for herself and her daughter. This factor strongly favors respondent.

After considering all of the above factors, as applied to the unique facts and circumstances of this case, we conclude that petitioner's horse activity was not engaged in for profit within the meaning of section 183. This activity, during the 3 years at issue, essentially involved two horses, Gallahad and Laddie. As early as 2002, when Gallahad was offered for sale by petitioner for $12,000 without attracting a buyer, it was or should have been evident to petitioner that she would not hit the jackpot with him. Laddie was sold in 2004 for $6,000 more than the acquisition cost, far short of a sufficient amount to cover losses of the horse activity and show a profit. The activity was always in the red and continued that way through at least 2007 with the greatest loss occurring in that year. The business never underwent substantial change. Therefore petitioner is not entitled to deduct expenses to the extent they exceed gross income from the horse activity.[8]

---

[8]We note that petitioner is entitled to the sec. 183(b) deductions up to the amount of income received in the horse activity. Respondent only disallowed petitioner's Schedule C net losses, which petitioner determined after accounting for any income from the horse activity in the years at issue.

The Court has considered all of petitioner's contentions, arguments, requests, and statements.  To the extent not discussed herein, we conclude that they are meritless, moot, or irrelevant.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.